**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Timothy W. Walsh
Christopher Thomson


Proposed Attorneys for the Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
In re:                                                   :          Chapter 11
                                                         :
PROJECT ORANGE ASSOCIATES, LLC,                          :          Case No.  10-12307
                                                         :
                              Debtor.                    :
------------------------------------------------------------- X

**AFFIDAVIT OF ADAM VICTOR PURSUANT TO
RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES**

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK   )


1.       I submit this Affidavit pursuant to Rule 1007-2 of the Local Rules of Bankruptcy

Procedure for the Southern District of New York.


2.       I am the President of Project Orange Associates, LLC, the debtor and debtor in

possession (the "Debtor") in the above-captioned case.  This affidavit has been prepared at my

direction and I have personal knowledge of the matters set forth herein.


3.       Unless otherwise indicated, the financial information set forth in this affidavit is

unaudited.

## **GENERAL BACKGROUND**

4.      On April 29, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The Debtor remains in possession of its assets and continues to manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      No trustee, examiner or creditors' committee has been appointed in this case.

7.      The Debtor owns and operates a steam-electric cogeneration facility (the "Facility") in Syracuse, New York that delivers electric services to the State of New York.  The Debtor has been a reliable source of electric capacity, energy, and voltage support for the Syracuse area since 1992 and is qualified under the Federal Energy Regulatory Commission as an exempt wholesale generator.  In addition, the Debtor provides electrical services to the New York Independent System Operator ("NYISO"), the non-profit organization that administers and monitors the wholesale electricity markets and is responsible for the dispatch of over 500 electric power generators.

8.      Until recently, the Debtor has also supplied steam, at a highly discounted rate, to Syracuse University (the "University"), fulfilling the needs of the University's campus buildings, as well providing steam for resale by the University to three area hospitals and a state college.

9.      The Facility is located at 520 East Taylor Street, Syracuse, New York 13202.  The Debtor leases the real property on which the Facility is located from the University.  The Debtor's corporate office (the "Corporate Office") is located at 630 First Avenue, Suite 30C, New York, New York 10016.

EAST\42896507.11

10.     The Debtor employs three administrative staff personnel in the Corporate Office. The Debtor also employs eight experienced independent contractors who specialize in the areas of: (i) operations and maintenance; (ii) engineering support; and (iii) asset management.

11.     The Debtor holds all the necessary environmental permits, as mandated by the Environmental Protection Agency and the New York State Department of Environmental Conservation, and, to the best of my knowledge, is in compliance with all environmental regulations.

12.     The Debtor has historically been a profitable cogeneration facility, in large part because of a long term agreement with a New York State Electric Utility (Niagara Mohawk Power Corporation), under which the Debtor was afforded a fixed income stream.  However, the Debtor has experienced a steady decline in revenue and profitability resulting from (i) the State of New York's termination of the Debtor's 40-year electric contract which caused the deregulation of the electric markets, (ii) the loss of the fixed price energy contract, (iii) a string of mechanical failures at the Facility, (iv) a decrease in market demand, and (v) extraordinary legal fees incurred as a result of two major contract disputes.

13.     As of the Petition Date, the assets of the Debtor were valued at approximately $87,176,724.  The Debtor's total liabilities are approximately $30,477,075.70.

## **OPERATIONS**

### *Contractual Relationship with Syracuse University*

14.     In 1990, the Debtor and the University entered into an agreement under which the Debtor would furnish steam to the University and neighboring entities at a below market rate (a

33% discount to the University's "avoided cost" to produce steam) (the "Steam Contract"). In October 2007, the Debtor learned that the cost to produce steam by the University, which determined the price of steam under the Steam Contract, was (purposefully and fraudulently) too low. The Debtor, therefore, commenced litigation against the University with respect to the questionable pricing under the Steam Contract. To supplement the arrangement, the parties executed two additional agreements: (i) a lease agreement (the "Lease Agreement") whereby the University leased a vacant parcel of land to the Debtor on which the Facility was eventually constructed and (ii) an operating agreement (the "Operating Contract") by which the Debtor was allowed to operate and use the University's existing steam plant facility (the "Pre-Existing Steam Plant") as a back-up to the Facility, in lieu of the Debtor building its own back-up plant.

15. In 1992, the Debtor completed construction of the Facility at a cost of $200 million, which was funded solely with the Debtor's funds and mortgage proceeds. After completion of the Facility, the Debtor owned and operated the Facility until October 19, 2009, maintained the University's Pre-Existing Steam Plant, and, until recently, supplied steam to the University.

***Contractual Relationship with Niagara Mohawk Power Corporation***

16. In addition to the aforementioned agreements entered into with the University, the Debtor also entered into a contract (the "Niagara PPA") with Niagara Mohawk Power Corporation ("Niagara Power"), a New York State electric utility. The Niagara PPA had an intended term of 40 years, and provided the Debtor with a fixed revenue stream. Under the Niagara PPA, Niagara Power was obligated to purchase electricity for a fixed minimum sales price of six cents per kilowatt hour. The fixed minimum sales price guaranteed cogenerators, such as the Debtor, favorable prices for electricity and allowed the Debtor to sell steam, a bi-

product of the energy production, at below market rates.  It was this arrangement, whereby the steam supplied to the University would be from waste or mere by-product, which allowed the Debtor to supply steam to the University at a below market rate.

## EVENTS LEADING UP TO THE BANKRUPTCY FILING

*Deregulation of the Energy Market and Loss of Guaranteed Income Stream*

17.     In 1998, in an attempt to avoid a looming bankruptcy by Niagara Power, the New York State Public Service Commission mandated a restructuring of all outstanding electric power purchase agreements, including the Niagara PPA.[1]  As a result of this restructuring, the arrangement the Debtor enjoyed under the Niagara PPA was replaced with a free market in which the Debtor was forced to "bid into" the market on a daily basis.  Under this new paradigm, the Debtor operates as a market participant and is no longer guaranteed a demand for its electricity.  The Debtor must now depend on being accepted into the often volatile and unpredictable daily market.  The transition resulted in a drastic decrease in the demand for electricity produced by the Facility and a significant loss in revenues for the Debtor.[2]

*Attempts to Streamline Operations and Increase Profitability*

18.     In 2000, as a result of the unexpected failure of one of the Turbines (defined below) and the huge amount of damages imposed by NYISO for non-performance, the Debtor decided to shed certain swap agreements, which severely penalized those facilities with no

---

[1]     The Niagara PPA was replaced with a Power Put Agreement (the "Power Put Agreement") and Indexed Swap Agreement (the "Swap Agreement"), and the Debtor was paid a lump sum payment of $153 million.  The Swap Agreement was subsequently sold by the Debtor to El Paso Corp. in exchange for a $73 million note repayable in 95 monthly installments.

[2]     Under the PPA Agreement, the Facility ran at what is referred to as "base load continuous operation" (running close to 90% of the year), however, once in the free market paradigm, the Facility was a "peeking plant" (running for approximately 20% of the year).

immediate electrical backup.  In an attempt to increase the profitability and ensure the continued viability of the Facility, the Debtor hired major energy trade advisors and consultants, including Coral Energy (a subsidiary of Shell Oil), Select Energy, Calpine Energy, and Bear Stearns Energy Ventures (now a division of JP Morgan Chase).  After considerable investment of time and capital, the Debtor implemented a number of sophisticated proprietary bidding paradigm models designed to improve the Facility's operating procedures, bidding procedures, and even investment in alternative fuel sources.  In recent years, the Debtor has become better equipped to compete in the open market and the Debtor's electric sales have steadily improved, while costs have steadily declined.

19.     However, despite all of these efforts, the Debtor is still not generating sufficient income due to the lack of reliable General Electric gas turbines.  The Steam Contract, discussed above in paragraph 14, was entered into in 1992.  At that time, the Niagara PPA ensured that the Debtor would remain profitable despite the below market agreed upon price for the steam.  After the deregulation of the energy market, and subsequent loss of the fixed income stream, the steam price became a significant financial burden on the Debtor.

### *Breakdown of Essential GE Turbine*

20.     The Debtor originally entered into an agreement (the "<u>Maintenance Agreement</u>") with General Electric International, Inc. ("<u>GE</u>") in July 1992, for the long term operation and maintenance of the Facility, including all necessary repairs of the two GE LM 5000 gas turbines (the "<u>Turbines</u>").  The Maintenance Agreement also obligated GE to take necessary measures to prevent future turbine failures.  However, in 2004, the Turbines began experiencing repeated failures, resulting in periods of either minimal or nonexistent energy production, and continued losses of revenue.

21.     In April 2005, one of the Turbines suffered a catastrophic failure, which led to a dispute between the Debtor and GE.  The dispute was temporarily resolved, and the parties amended the Maintenance Agreement (the "Amended Maintenance Agreement").

22.     However, the Turbines continued to repeatedly fail and breakdown, which led to periods of non-productivity during which the Debtor was not able to bid into the open market. Then, in July 2008, one of the Turbines (#157) completely failed after only 36 hours of service following repairs by GE.  GE sent the Turbine to Germany for repairs, where it remained for one year.  The second Turbine subsequently failed and for a period of time the Debtor had no Turbines.  GE later installed a loaner turbine.  Turbine #157 has not been returned to the Debtor.[3] At this time, the Debtor has only one functional Turbine in the Facility.  However, the Debtor is unable to operate the functional Turbine for long periods of time because of unsatisfactory repairs performed by GE.  As a result, the energy generated by the functional Turbine is dramatically below capacity and the Debtor has not been able to bid into the market at full potential.  Further, if this remaining Turbine fails, as the Debtor fears it will if operated at full capacity, the Debtor will no longer be eligible to receive the Capacity Payments (defined below) from NYISO.

23.     Under the current open market arrangement, the Debtor provides energy, capacity, and ancillary services.  These services are provided for public use via the competitive wholesale markets administered by the NYISO that are used to satisfy electric loads and capacity

_____

[3] The Turbine is the subject of an arbitration proceeding initiated by GE against the Debtor and is currently being held by GE in its Syracuse, New York warehouse.

requirements in New York State in an economical and reliable manner. The competitive bids provided by POA also help lower costs of electric service in New York State.

24. The Debtor is eligible to receive payments from NYISO for: (i) electricity produced and supplied to NYISO ("Energy Payments"); (ii) being available to produce electricity if called upon ("Capacity Payments"); (iii) selling "reactive" power in the form of Vars (volt-ampere reactive)—voltage support payments; and (iv) allowing NYISO to control the operating load levels of the generators while they are running ("Regulation Payments").[4] In order to optimize profits realized and benefit from all four potential sources of income, a cogeneration facility like the Debtor's must be able to run both Turbines. However, as discussed above, only one of the Turbines is currently functional, and, as a result, the Debtor is not able to fully realize its profit potential.

*GE Arbitration Proceeding*

25. GE and the Debtor have continued to disagree over outstanding invoices. On December 17, 2008, GE commenced an arbitration against the Debtor seeking to recover approximately $2.5 million. At that time, GE estimated the cost to repair Turbine #157 at $700,000. The estimated cost of repairs was less than the $1 million deductible. Over the next several months, the actual cost of repairs increased to $3.5 million. The appraised value of a replacement turbine is only $2 million. Moreover, GE sought to collect from the Debtor a total of $5,249,604.93 plus interest for services rendered in connection with the Amended Maintenance Agreement as well as termination of the Amended Maintenance Agreement. On

---

[4] Assuming that the Turbines are properly functioning, the average monthly Capacity Payment for one generator is approximately $140,000, the average monthly Regulation Payment for one generator is approximately $120,000, and the average monthly Energy Payment is approximately $340,000.

December 31, 2008, the Debtor was forced to seek a court order to ensure that the GE employees would remain at the Facility until the dispute was resolved.  On April 11, 2010, the arbitrator determined that GE's termination of the Amended Maintenance Agreement for non-payment of invoices was proper and awarded GE $4,113,017.35 plus interest.

***Litigation and Eviction Proceeding Initiated by the University***

26.     Even after the loss of the Niagara PPA (discussed above in paragraph 17), the Debtor continued to supply steam to the University at a below market rate for a period of eleven years.  During that time, the Debtor invested in a variety of measures in an attempt to lower fuel and other costs and increase revenue, including developing new proprietary energy trading. However, in the fall of 2007, when the Turbines experienced repeated failures, it was no longer possible for the Debtor to supply steam to the University at such a low rate and GE informed the University of the same.  The Debtor sought to renegotiate the steam price at a new rate, which was still significantly below the market price.  Moreover, the rate proposed by the Debtor was below any price that the University could achieve by running the Pre-Existing Steam Plant, part of which is over 80 years old.

27.     The negotiations between the University and the Debtor lasted approximately three years, and although a number of term sheets and potential settlements were exchanged, an agreed upon price for the steam could not be reached.  In October 2009, the Debtor sent a notice to the University that it would be forced to temporarily cease supplying steam.  The University now claims that the temporary cessation amounted to a repudiation by the Debtor of the Steam Contract.  Since 2009, however, the Debtor has offered to provide nearly 50% of the University's steam load for free, if the Debtor would be allowed to produce electricity for the New York State Electric Grid.  The University has declined to accept the offer of free steam.  The University

- 9 -

commenced legal action against the Debtor seeking to terminate the Steam Contract, Operating Contract, and the Lease Agreement. The Debtor has offered to negotiate a settlement with the University, but the University has refused to negotiate. As of the Petition Date, the Debtor no longer provides the University with steam and there has been no final judgment with respect to the breach of contract action.

28.     Project Orange Associates Services Corporation (the "POASC"), an affiliate of the Debtor, initiated a condemnation proceeding in order for the Debtor to continue its business operations and to supply electric services to the NYISO for the benefit of the Syracuse area and the statewide electrical grid. The POASC has recently filed a notice of appeal with the State of New York Court of Appeals with respect to the condemnation proceeding.

## SUMMARY OF FIRST DAY MOTIONS[5]

29.     To enable the Debtor to operate effectively and to avoid the adverse effects of the chapter 11 filing, the Debtor has filed, or will file upon scheduling of a further hearing by this Court, the motions (the "First Day Motions") described below.

30.     In connection with the preparation for this bankruptcy case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance or the input and assistance of employees working under my supervision and bankruptcy counsel. I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtor's reorganization efforts.

***Motion of the Debtor for an Order Pursuant to Bankruptcy Rule 1007(c) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Motion for Extension of Time for Filing Schedules and SOFA")***

31.     By the Motion for Extension of Time for Filing Schedules and SOFA, the Debtor seeks an order extending its time for filing the Schedules and Statements of Financial Affairs ("SOFAs") for an additional fourteen (14) days (for a total of twenty-eight (28) days).

32.     As a result of the nature of the Debtor's chapter 11 filing, the Debtor has not yet commenced preparation of its schedules and statements, and I do not believe that the fourteen-day automatic extension of time to file its Schedules and SOFAs will be sufficient to permit completion of the Schedules and SOFAs.

33.     At this juncture, I believe that an extension of fourteen (14) days (for a total of twenty-eight (28) days) will provide sufficient time to prepare and file the Schedules and SOFAs.

***Motion of Debtor Pursuant to Bankruptcy Code Section 105(a), 363(b) and 507 for an Interim Order Authorizing Payment of Prepetition (I) Wages and Salaries of Staff and (II) Payroll Taxes (the "Wage Motion")***

34.     By the Wage Motion, the Debtor seeks authority to, among other things, satisfy certain of its prepetition obligations to its current employees (the "Employees") and independent contractors (the "Independent Contractors"), reimburse Employees and Independent Contractors for prepetition expenses that were incurred on behalf of the Debtor and pay prepetition payroll-

---

*(footnote continued from previous page)*
    Capitalized terms used but not defined in this section have the meanings given them in the applicable First Day Motion.

related taxes associated with the Debtor's employee wage claims and other similar tax obligations. This relief is critical to the Debtor's business and reorganization efforts.

35.     In addition, the Debtor is requesting an order authorizing Signature Bank or the bank at which the Debtor maintains a debtor in possession operating account relating to payroll to receive, process, honor and pay all payroll and employee benefit-related checks, drafts, wires, or automated clearing house transfers, provided sufficient funds are available to honor all such payments, without regard to when the applicable payroll check was issued

36.     I believe that any delay in paying prepetition employee obligations will adversely impact the Debtor's relationship with its Employees and Independent Contractors and will irreparably impair the Employees' and Independent Contractors' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in the case, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' and Independent Contractors' morale and cooperation attributable to the Debtor's failure to pay wages, salary, benefits and other similar items.

***Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Potentially Secured Party and (III) Scheduling a Final Hearing (the "Cash Collateral Motion")***

37.     By the Cash Collateral Motion, the Debtor seeks to ensure access to the proceeds of the Debtor's daily business activities. The University is likely to claim that the proceeds of the Debtor's operations are revenues in which the University has a valid security interest which would constitute cash collateral (the "Cash Collateral") under section 363(a) of the Bankruptcy Code.

38.     Without access to Cash Collateral, the Debtor will be forced to immediately cease operations as it will have no revenues. At this time, the Debtor lacks a source of sufficient funds

other than the Cash Collateral with which to effectuate a successful chapter 11 reorganization. The Debtor's ability to operate its business and maximize the value of its assets for the benefit of creditors, including the University, is dependent on its ability to use the Cash Collateral.

39.     While I do not believe the University has any security interest in the revenues the Debtor generates from its current operations, which do not involve any of the contracts named in the security contracts, the Debtor does require access to its revenue in order to reorganize. Thus, to the extent that this Court believes these revenues constitute cash collateral, the Debtor requires its use.

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

### *S.D.N.Y. LBR 1007-2(a)(i)*

40.     This information is provided in the general background above.

### *S.D.N.Y. LBR 1007-2(a)(ii)*

41.     The case was not originally commenced as a chapter 7, chapter 12 or chapter 13 case.

### *S.D.N.Y. LBR 1007-2(a)(iii)*

42.     To the best of my knowledge, no unofficial creditor or other committees were formed prior to the filing of the Debtor's chapter 11 case.

### *S.D.N.Y. LBR 1007-2(a)(iv)*

43.     A list containing the names, addresses and the amounts of the claims of the Debtor's twenty (20) largest known, noninsider, unsecured creditors, is annexed hereto as Exhibit A. Exhibit A designates the amount of the claim, and indicates whether the claim is contingent, unliquidated, disputed, or partially secured.

***S.D.N.Y. LBR 1007-2(a)(v)***

44.    A list containing the names, addresses and the amounts of the claims of the Debtor's secured creditors is annexed hereto as <u>Exhibit B</u>.  Exhibit B designates the amounts of each claim and provides a brief description and estimate of the value of the collateral securing each claim, indicating whether such claim is disputed.  The Debtor reserves its rights to dispute the amount and/or secured status of these claims.

***S.D.N.Y. LBR 1007-2(a)(vi)***

45.    A summary of the Debtor's assets and liabilities on an unaudited basis is annexed hereto as <u>Exhibit C</u>.

***S.D.N.Y. LBR 1007-2(a)(vii)***

46.    To the best of my knowledge, there are no classes of shares of stock, debentures, or other securities of the Debtor that are publicly held.

***S.D.N.Y. LBR 1007-2(a)(viii)***

47.    GE, in relation with a lawsuit and recently decided arbitration, is in possession of a General Electric LM50000 gas turbine.  The Turbine, referred to as Unit #2 LM 5000 Gas Turbine #157 is valued at approximately $2 million (GE billed the Debtor for $3.5 million in repairs for this Turbine) and is housed in a GE warehouse in Syracuse, New York.

48.    GE is also in possession of Debtor's Unit #1 LM PT Power Turbine, which was sent out for repairs and overhaul to GE's facilities in Houston, Texas.  The asset is valued at approximately $1.5 million.

49.     GE is in possession of the Debtor's spare parts inventory and is currently being stored by GE in its Syracuse, New York warehouse.  The spare parts inventory is worth approximately $1,000,000.

50.     To the best of my knowledge, there is no other property of the Debtor in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

### S.D.N.Y. LBR 1007-2(a)(*ix*)

51.     A schedule setting forth the premises that the Debtor currently owns, leases, or otherwise holds or from which it operates business is annexed hereto as Exhibit D.

### S.D.N.Y. LBR 1007-2(a)(*x*)

52.     The Debtor's books and records are located at the Debtor's Corporate Office at: 630 First Avenue, Suite 30C, New York, New York 10016.  The Debtor's substantial assets are located at 520 East Taylor Street, Syracuse, New York 13202.  The Debtor's have no assets located outside the territorial limits of the United States.

### S.D.N.Y. LBR 1007-2(a)(*xi*)

53.     A list identifying each action (pending or threatened) against the Debtor or its properties where a judgment or a seizure of their property may be imminent is annexed hereto as Exhibit E.

### S.D.N.Y. LBR 1007-2(a)(*xii*)

54.     The names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a  brief summary of their relevant responsibilities and experience is attached hereto as Exhibit F.

***S.D.N.Y. LBR 1007-2(a)(xiii)***

55.     The estimated amount of the bi-weekly payroll to Employees (exclusive of officers, directors, stockholders, and partners,) for the thirty (30) day period following the filing of this chapter 11 case is approximately $6,371.00.   The estimated bi-weekly payroll to Independent Contractors for the thirty (30) day period following the filing of this chapter 11 case is approximately $12,000.

***S.D.N.Y. LBR 1007-2(a)(xiv)***

56.     The Debtor is a limited liability company.  The Debtor estimates that for the thirty (30) day period following the commencement of this chapter 11 case, the amount paid or proposed to be paid in payroll, including fees, salaries and other compensation for the Debtor's executive officers, stockholders, and directors and other salaried employees, is approximately $0.00.

***S.D.N.Y. LBR 1007-2(a)(xv)***

57.     A schedule setting forth, for the thirty (30) day period following the filing of the chapter 11 petition, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and any other information relevant to the foregoing, is attached hereto as Exhibit G.

58.     A copy of the resolution of the Debtor's members authorizing the filing of the Debtor's chapter 11 petition is annexed hereto as Exhibit H.

## CONCLUSION

In furtherance of the reorganization efforts, the Debtor respectfully requests that the orders granting the relief requested in the First Day Motions be entered.

Dated: April 29, 2010

_____
Adam Victor
President
Project Orange Associates, LLC

Sworn to before me this
29th day of April, 2010

_____
Notary Public

Notary Public,
No._____
Qualified in _____
Commission Expires _____

MARTA GRABOWSKA
Notary Public - State of New York
NO. 01GR6175635
Qualified in Kings County
My Commission Expires 10/22/2011

# Exhibit A

## Debtor's 20 Largest Known Unsecured Creditors as of April 29, 2010 (excluding Insiders)

| (1)<br>Name of Creditor and Complete Mailing Address Including Zip Code | (2)<br>Name, Telephone, Fax, and/or Email of Agent or Employee who may be Familiar with Claim | (3)<br>Nature of Claim | (4)<br>Whether Claim is Contingent, Unliquidated, Disputed or Subject to Setoff | (5)<br>Amount of Claim |
|---|---|---|---|---|
| General Electric International<br>4200 Wildwood Parkway<br>Atlanta, GA 30339 | Contact: Ms. Angela E. Dotson (Counsel GE Energy)<br>Tel: (678) 844-5865<br>Fax: (678) 844-6212 | Arbitration Award | | $4,113,017.35 |
| City of Syracuse, Department of Finance<br>Room 122, City Hall<br>Syracuse, NY 13221 | Commissioner of Finance<br>Tel: (315) 448-8279<br>Fax: ( 315) 471-6024 | Taxes | Disputed | $1,428,601.50 |
| Davis and Gilbert LLP<br>1740 Broadway<br>New York, NY 10019 | Contact: Paul Corcoran<br>Tel: (212) 468-4800<br>Fax: (212) 468-4888 | Services | | $883,589.76 |
| Thomas Puccio, Esq.<br>230 Park Ave, Suite 301<br>New York, NY 10169 | Tel: (212) 883-6383<br>Email: tpuccio@lotpp.com | Services | | $375,000.00 |
| Gas Orange Development<br>630 First Ave, Suite 30 C<br>New York, NY 10016 | Tel: 212-725-1956<br>Fax: 212-725-1993 | Promissory Note | | $299,650.00 |
| National Grid<br>70 Jefferson Blvd.<br>Warnick, RI 02888-6401 | Contact: Christopher Gorman<br>Tel: (508) 389 2000<br>Fax: (508) 389-3198<br>Christopher.Gorman@us.ngrid.com | Utility | Disputed | $177,032.68 |
| Mackenzie Hughes, LLP<br>P.O. Box 4967<br>Syracuse, NY 13221-4967 | Contact: Mr. Helmer<br>Tel: (315) 474-7571<br>Fax: (315) 474-6409 | Services | | $104,268.47 |
| JP Morgan<br>700 Louisiana St. Suite 1000<br>Houston, TX 77002 | Contact: Jeff Bell<br>Tel: (713) 236-4153<br>Jeff.Bell@jpmorgan.com | Trade debt | Disputed | $91,967.56 |
| Walter G. Gans<br>159 W. 53rd St, Apt 27E<br>New York, NY 10019 | Tel: 212-319-7010<br>Email: wgans@rcn.com | Trade debt | | $86,068.25 |
| Fix Spindelman Brovitz & Goldman<br>295 Woodcliff Drive, Suite 200<br>Fairport, NY 14450 | Contact: Norman Spindelman<br>Tel: (585) 641-8000<br>Fax: (585) 641-8080 | Services | | $77,086.50 |
| Chartis National Union Fire Insurance Company of Pittsburgh, PA<br>PO Box 30174<br>New York, NY 10087- 0174 | Contact: Monique Johnson<br>Tel: (718) 250-1591<br>Fax: (718)250-1658 | Insurance | Disputed | $69,676.71 |

| (1)<br>Name of Creditor and Complete Mailing Address Including Zip Code | (2)<br>Name, Telephone, Fax, and/or Email of Agent or Employee who may be Familiar with Claim | (3)<br>Nature of Claim | (4)<br>Whether Claim is Contingent, Unliquidated, Disputed or Subject to Setoff | (5)<br>Amount of Claim |
|---|---|---|---|---|
| Read and Laniado, LLP<br>25 Eagle Street<br>Albany, NY 12207 | Contact: Sam Laniado<br>Tel: (518) 465-9313<br>Fax: (518) 465-9315 | Services | | $59,272.45 |
| City of Syracuse, Department of Water<br>106 City Hall<br>Syracuse, NY 13202 | Contact: Diane Desormeaux<br>Tel: (315) 448-8238<br>Fax: (315) 448-8262 | Utility | Disputed | $57,267.95 |
| City of Syracuse, Host Community<br>(Agreement Billing)<br>233 E. Washington Street, Rm 122<br>Syracuse, NY 13202 | Contact: Sandy Hayes<br>Tel: ( 315) 448-8310<br>Fax( 315) 471-6024 | Trade Debt | Disputed | $51,112.00 |
| TSG Reporting, Inc.<br>747 Third Avenue, 28th Floor<br>New York, NY 10017 | Tel: (877) 702-9580<br>Fax: ( 212) 207-3311 | Services | | $39,025.15 |
| American Arbitration Association<br>950 Warren Avenue<br>East Providence , RI 02914 | Tel: (401)-431-4708<br>Fax: ( 401) 431-4708 | Fee | | $35,521.13 |
| Laurel Johnson<br>1119 G Street, Apt 6<br>Marysville, CA 95901 | Tel: (530) 218-3387<br>Email: larryrj50@hotmail.com | Wage Claim | Disputed | $33,392.01 |
| Trial Graphix, Inc.<br>P.O. Box 202632<br>Dallas, TX 75320-2632 | Contact: Mr. Soto<br>Tel: (800) 334-5403<br>Fax: (305) 576-0188 | Trade Debt | | $32,626.84 |
| Slater Consulting<br>299-C Girard Street<br>Havre De Grace, MD 21078 | Contact: Kenneth Slater<br>Tel: (410) 939-4887<br>Email: kjs@slater-consulting.com | Trade Debt | Disputed | $15,490.06 |
| AECOM<br>2 Technology Park Drive<br>Westford, MA 01886 | Contact: Jeffrey Gorman<br>Tel: (978) 589-3000<br>Fax: (978) 589-3100 | Services | | $12,500.00 |

**<u>Exhibit B</u>**

**Debtor's 5 Largest Known Secured Creditors as of April 29, 2010**

| Creditor | Address and Telephone | Amount of Claim | Nature of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| BP Energy Company | 501 Westlake Park Boulevard<br>Houston, TX 77079<br>Tel: (713) 323-2567 | Unknown | Debtor's interest in payments received from New York Independent Service Operator and all products and proceeds thereof. | |
| Syracuse University | Skytop Office Building<br>Syracuse, NY 13244<br>Tel: (315) 443-4188 | Unknown | Debtor's rights and interests in its project contracts, as well as proceeds derived therefrom (excluding money). | D |
| General Electric International, Inc. | 4200 Wildwood Parkway<br>Atlanta, GA 30339<br>Attn: Att: Ms. Angela E. Dotson<br>Tel: (678) 844-5865 | Unknown | Lien | D |
| El Paso Corporation | P.O. Box 2511<br>Houston, TX 77252<br>Tel: (713) 420-3826 | $19,694.97 | Letter of Credit | D |

EAST\42896507.11

**Exhibit C**

**Assets and Liabilities as of April 29, 2010 (Unaudited)**

# PROJECT ORANGE ASSOCIATES, LLC
## Assets and Liabilities as of April 29, 2010[1]

**Assets**

| | | |
|---|---|---|
| Cash | $ | 41,000.00 |
| Accounts Receivables, net | $ | 65,224.69 |
| Restricted Cash/Letter of Credit | $ | 70,500.00 |
| Property and Equipment | | $28,000,000.00 |
| Intangibles Other Assets[2] | | $59,000,000.00 |

TOTAL ASSETS

$87,176,724.00

**Liabilities**

| | |
|---|---|
| Accounts Payable | $18,477,075.70 |
| Long Term Liabilities[3] | $12,000,000.00 |

TOTAL
LIABILITIES

$30,477,075.70

---

[1] The estimates are being provided by the President. A formal appraisal of all assets and liabilities has not yet been performed.
[2] Value calculated over 22 years, discounted at a rate of 15%.
[3] Estimated liability calculated over 22 years, discounted at a rate of 15%.

**<u>Exhibit D</u>**

**Location of Property**

Premises that the Debtor currently leases and from which it operates business:

    1)      520 East Taylor Street
              Syracuse , NY 13202

    2)      630 First Avenue, Suite 30C
              New York, NY 10016

**Exhibit E**

**Litigation**

Each action pending or threatened against the Debtor or its properties where a judgment or a seizure of their properties may be imminent.

**Syracuse University v. Project Orange Associates, LLC**, Supreme Court of New York, County of Onondaga, Index No. 2009-7882. RJI No. 33-09-4590. Eviction proceeding. Pending, hearing scheduled for April 30, 2010.

**Project Orange Associates, LLC v. Syracuse University**, Supreme Court of New York, County of Onondaga, Index No. 2009-7310. RJI No. 33-09-4251. Yellowstone injunction. Pending.

**Syracuse University v. Project Orange Associates, LLC**, Supreme Court of New York, County of Onondaga, Index No. 2008-8203. RJI No. 33-08-4335. Declaratory Judgment Action. Pending.

**General Electric International, Inc. v. Project Orange Associates, LLC**, American Arbitration Association Commercial Arbitration Tribunal, No. 13-198-Y-02918-08. Contract Dispute. Judgment entered against Project Orange Associates, LLC in the amount of $4,113,017.35.

**General Electric International, Inc. v. Project Orange Associates, LLC**, Supreme Court of New York, County of New York, Index No. 117245-2008. Motion to Confirm Award. Pending in New York County Supreme Court.

# Exhibit F

## Senior Management

Names of individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities.

| Name | Title | Tenure | Responsibilities |
| --- | --- | --- | --- |
| Adam Victor | President | 18 years | Oversees all aspects of operations. |

**Exhibit G**

**Cash Flow Projection For the Thirty (30) Day Period Following the Filing of the Chapter 11 Petition[6]**

| Cash Receipts | $65,224.69 |
|---|---|
| Cash Disbursements | $52,100 |
| Net Cash Gain/Loss | $13,124.69 |
| Unpaid Obligations | $53,500 |
| Uncollected Receivables | $95,000 |

[6] All figures provided are estimates by the Debtor and are subject to change.

**Exhibit H**

**Member Resolutions**

# WRITTEN CONSENT OF THE SOLE MEMBER OF PROJECT ORANGE ASSOCIATES, LLC

## April 29, 2010

The undersigned, being the sole member (the "<u>Member</u>") of Project Orange Associates, LLC, a Delaware limited liability company (the "<u>Company</u>"), does hereby consent to, adopt, and approve the following resolutions and each and every action effected thereby, pursuant to the Company's governing documents and applicable state law, and direct that the same be filed with the minutes of the proceedings of the Company:

RESOLVED, that in the judgment of the Member, it is desirable and in the best interest of the Company, its creditors, employees, and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"); and it is further

RESOLVED, that any of the Chief Executive Officer and President ("<u>Authorized Person</u>"), be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to execute and verify the Company's petition under chapter 11 of the Bankruptcy Code, thereby commencing the chapter 11 case (the "<u>Chapter 11 Case</u>") and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") or in such other authorized jurisdiction and at such time as such Authorized Person executing the petition shall determine; and it is further

RESOLVED, that the law firm of DLA Piper LLP (US) be, and hereby is, engaged as counsel for the Company under a general retainer in the Chapter 11 Case, subject to any requisite approval of the Bankruptcy Court; and it is further

RESOLVED, that any Authorized Person be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to execute and file, in addition to the petition, all schedules, motions, lists, applications, pleadings, and other documents, and to take and perform any and all further acts and deeds which such Authorized Person deems necessary, appropriate, proper, or desirable in connection with the Chapter 11 Case, with a view to the successful prosecution of such case; and it is further

RESOLVED, that any Authorized Person be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to engage and retain all assistance by legal counsel, accountants, financial advisors, restructuring advisors, and other professionals in connection with the Chapter 11 Case, on such terms as such Authorized Person deems necessary, appropriate, proper or desirable, with a view to the successful prosecution of such case; and it is further

RESOLVED, that in connection with the Chapter 11 Case, (a) the Member authorizes and approves (i) the execution, delivery and performance of a debtor-in-possession credit agreement (the "<u>Credit Agreement</u>"), substantially on the terms of the draft credit agreement and/or term sheet which have been provided to the Member and with such changes thereto as the Authorized Person executing the same shall approve, and any security agreements, guarantee agreements, other agreements, notes, consents, certificates, amendments, assignments and instruments in connection therewith (the "<u>Credit Documents</u>" and together with the Credit Agreement, the "<u>Financing Documents</u>"), (ii) the granting of a security interest in any assets of

the Company as collateral and/or the guaranty of the obligations of the debtors under the Credit Agreement, and (iii) any transactions effected or to be effected pursuant to the terms and provisions of the Financing Documents; and (b) any Authorized Person be, and hereby is, authorized and empowered, in the name and on behalf of the Company, to negotiate, execute, deliver, and perform or cause the performance of the Financing Documents, as such Authorized Person executing the same considers necessary, appropriate, proper, or desirable to effectuate the transactions contemplated by the Financing Documents and other financing arrangements necessary, appropriate, proper, or desirable in the interest of the Company in connection with the Chapter 11 Case, such determination to be conclusively evidenced by such execution or taking of such action; and it is further

RESOLVED, that in connection with the conduct of the business and affairs of the Company during the Chapter 11 Case, any Authorized Person be, and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to negotiate, execute, deliver, enter into, file and/or record any and all of the agreements, instruments, motions, certifications, applications, consents, assignments, and other documents referenced herein and such other agreements, instruments, applications, consents, assignments, and other documents as may be or become required or as such Authorized Person deems appropriate or advisable, and to perform or cause the performance thereof, with the execution, delivery, certification, filing, or recording thereof to constitute evidence of such approval, and to take such other actions as, in such Authorized Person's judgment, shall be or become necessary, appropriate, proper, or desirable or to effectuate the resolutions adopted and matters ratified or approved herein, the consummation of the transactions contemplated hereby, and a successful reorganization of the Company; and it is further

RESOLVED, that any Authorized Person be, and hereby is, authorized, empowered, and directed in the name and on behalf of the Company, to execute such consents of the Company as such Authorized Person considers necessary, appropriate, proper, or desirable to effectuate these resolutions, such determination to be conclusively evidenced by such execution or taking of such action; and it is further

RESOLVED, that any and all past actions heretofore taken or caused to be taken by any Authorized Person in the name and on behalf of the Company that would be permitted to be taken by the preceding resolutions if such resolutions had been adopted before the time such actions were taken or caused to be taken, and the same are hereby ratified, approved, confirmed, and adopted in all respects.


[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first written above.

Project Orange Associates Holdings, LLC Member

By: _____

Adam H. Victor
President

Sworn to before me this
29th day of April, 2010

_____
Notary Public

Notary Public,
No._____
Qualified in _____
Commission Expires

MARTA GRABOWSKA
Notary Public - State of New York
NO. 01GR6175635
Qualified In Kings County
My Commission Expires 10/23/2011