UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                             :

In re:                                   :

                                              :

PROJECT ORANGE ASSOCIATES, LLC,        :

                                              :

                      Debtor.          :

                                              :

------------------------------------------------------------x

**FOR PUBLICATION**

Chapter 11

Case No. 10-12307 (MG)

## MEMORANDUM OPINION AND ORDER SUSTAINING THE UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF DLA PIPER LLP (US) AS COUNSEL *NUNC PRO TUNC* TO THE PETITION DATE

*A P P E A R A N C E S:*

DIANA G. ADAMS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, NY 10004
By:     Elisabetta G. Gasparini, Esq.

DLA PIPER LLP (US)
*Proposed Attorneys for the Debtor*
*and Debtor in Possession*
1251 Avenue of the Americas
New York, New York 10020-1104
By:     Timothy W. Walsh, Esq.
            Christopher R. Thompson. Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

         This opinion addresses an important issue whether the use of conflicts counsel to deal

with the debtor's largest unsecured creditor and essential supplier is sufficient to permit court

approval under section 327(a) of the Bankruptcy Code of a debtor's choice for general

bankruptcy counsel that also represents that creditor in unrelated matters.  Project Orange

Associates, LLC ("Project Orange" or "Debtor") seeks to retain DLA Piper LLP (US) ("DLA

Piper") as general bankruptcy counsel pursuant to section 327(a) of the Bankruptcy Code.  The

United States Trustee ("U.S. Trustee") objects, arguing that DLA Piper's representation of

certain General Electric ("GE") entities, as well as inadequate disclosure about DLA Piper's

relationship with other creditors, requires the Court to deny DLA Piper's employment

application.  GE is the Debtor's largest unsecured creditor.  Perhaps more importantly, the

Debtor has acknowledged that resolving all past and future issues with GE—the supplier of gas

turbines to Debtor's operations—is essential to the Debtor's successful reorganization.  DLA

Piper argues that it does not have a disqualifying conflict with GE, and that, in any event, the

Debtor's use of conflicts counsel to deal with certain aspects of the Debtor's relationship with

GE, is sufficient to avoid DLA Piper's conflict and to permit its retention as general bankruptcy

counsel.  For the following reasons, the Court agrees with the U.S. Trustee and denies DLA

Piper's employment application.

## I.  BACKGROUND

The Debtor filed for chapter 11 protection in this Court on April 29, 2010.  On May 20,

2010, DLA Piper filed its employment application (the "DLA Employment Application").  (ECF

# 58.)  The U.S. Trustee filed its objection on May 27, 2010 (the "U.S. Trustee's Obj.").  (ECF #

68.)  The Court heard argument on the DLA Employment Application on June 7, 2010.

Following the hearing, DLA Piper requested permission to file a supplemental brief in support of

the DLA Employment Application.  (ECF # 95.)  The Court granted the request, permitting both

DLA Piper and the U.S. Trustee to file supplemental briefs.  (ECF # 96.)

The Debtor has retained ownership and continues to operate a steam and electricity

cogeneration facility (the "Facility") in Syracuse, New York.  (Affidavit of Adam Victor

Pursuant to Rule 1007-2 of the Local Bankruptcy Rules ("Victor Local Rule 1007-2 Aff.") at ¶¶

5–7 (ECF # 4).)  The Debtor attributes its current financial predicament to the deregulation of

the New York State energy market, ongoing litigation with Syracuse University (where the
cogeneration facility is located pursuant to a lease and other agreements), and maintenance issues
with two electric turbines (the "Turbines") manufactured and, until recently, maintained by GE.
(*See id.* at ¶¶ 12–16.) The Debtor earns money by, *inter alia*, providing electrical services to the
New York Independent System Operator ("NYISO"), an entity charged with overseeing New
York's electricity markets.  NYISO makes payments to the Debtor for (i) producing and
supplying electricity to NYISO ("Energy Payments"); (ii) being available to produce electricity,
if required ("Capacity Payments"); (iii) selling "Vars" or so-called "reactive power"; and (iv)
permitting NYISO to control the load levels of the Debtor's generators while they are operational
("Regulation Payments").  The Debtor states that it is not generating sufficient income because
of maintenance issues with its GE gas turbines.[1]  (*Id.* at ¶ 24.)

A.      **The Debtor's History with GE**

In 1992, Project Orange and GE entered into a maintenance agreement (the "Maintenance
Agreement") for long term maintenance, including necessary repairs to the Turbines.  The
Debtor states that, starting in 2004, the Turbines began suffering from failures that impacted
Project Orange's energy production.  (*Id.* at ¶ 20.)  The problems continued throughout 2004,
and according to the Debtor, in April 2005 one of the Turbines suffered a "catastrophic failure."
Following this event, GE and Project Orange amended the Maintenance Agreement.  (*See id.* at ¶
21.)

---

[1]      Debtor's cogeneration facility was built on property owned by Syracuse University.  The Debtor and
Syracuse University are parties to a written lease that by its terms is scheduled to expire in 2032.  Syracuse
University argues, however, and the parties have litigated in state court for several years, that the lease terminated
prepetition because of Project Orange's defaults in the lease and other agreements between them.  The details of the
dispute are omitted from this Opinion.  Suffice it to say, however, that if the lease terminated prepetition, the Debtor
is unlikely to be able to reorganize as an operating business.  Syracuse University has filed a motion to lift the
automatic stay to permit it to proceed with the state court litigation.  A separate opinion or order will be entered
concerning that motion.

These contractual changes did not resolve the Debtor's issues with the Turbines.  The Turbines allegedly continued to breakdown, and in 2008 one Turbine failed less than two days after being repaired by GE.  GE removed the Turbine for repairs.  Shortly afterwards the remaining Turbine failed, leaving Project Orange with no operational turbines and prompting GE to install a temporary loaned turbine.  The Debtor, however, claims that it cannot operate this loaned turbine for extended periods of time due to faulty maintenance performed by GE.  This negatively affects the Energy Payments the Debtor receives from NYISO for providing electricity as well as the Regulation Payments the Debtor receives in consideration for allowing NYISO to control load levels of its Turbines when operating.  The Debtor also maintains that operating the replacement turbine at capacity would result in its failure, stripping the Debtor of the Capacity Payments NYISO makes in consideration of the Debtor's availability to produce electricity, if necessary.  (*Id.* at ¶ 22.)

The Debtor's issues with GE eventually led to disagreements over invoices.  On December 17, 2008, GE commenced an arbitration against Project Orange to recover approximately $2.5 million in outstanding fees and $5,249,604.93 plus interest for services rendered and termination of the Maintenance Agreement (the "Arbitration").  On April 11, 2010, the arbitrator concluded that GE properly terminated the Maintenance Agreement and awarded GE $4,113,017.35 plus interest.  The Debtor's schedules reflect a claim in this amount in favor of GE.  (*Id.* at ¶ 25.)  GE filed a motion to have the arbitration award confirmed in New York State Supreme Court.  Briefing in that matter is stayed as a result of the automatic bankruptcy stay.  GE also filed a motion requesting relief from the automatic stay to permit the state court to confirm the arbitration award.  (*See* U.S. Trustee's Obj. at ¶¶ 16–17.)

Despite these issues, the Debtor now maintains that "all major litigation with GE has been substantially resolved." (DLA Piper's Resp. to U.S. Trustee's Obj. at 1 (ECF # 84).) Indeed, the Debtor has presented a settlement stipulation (the "Stipulation") between itself and GE to the Court for approval. (ECF # 118.) The Stipulation recites that GE asserts that, at a minimum, $1,227,152.99 of the Arbitration award represents amounts invoiced for services in repairing one of the Turbines and is secured by a possessory artisan's lien on the Turbine and spare parts. (Stipulation at ¶ E.) The terms of the Stipulation call for certain payments to GE, funded by the Debtor's various insurers, to satisfy this lien and pay for the installation of certain Turbine components, a gas generator and accompanying spare parts. (Stipulation at ¶ 3.) These payments, however, do not eliminate GE's entire claim against Project Orange, only the secured portion. (Stipulation at ¶ 3(c).) After receipt of these amounts, GE would deliver the gas generator and the spare parts to the Debtor. GE would then install these components after the completion of repairs and installation of another key Turbine component, the power turbine.

### B.      DLA Piper's Relationship with GE and other Potential Parties in Interest

The Debtor's application to employ DLA Piper is supported with three declarations from Timothy W. Walsh ("Walsh"), a partner and Vice Chair of DLA Piper's Restructuring Practice Group. The first Walsh Declaration (the "Initial Walsh Declaration") reveals that Walsh and his partners represent certain GE affiliates in matters unrelated to this bankruptcy. (Initial Walsh Declaration at ¶ 8 (ECF # 58).) Walsh maintains that the "vast majority" of work DLA Piper completes for GE entities is for General Electric Healthcare ("GEHC"). (*Id.*) The Initial Walsh Declaration also discloses that the GE affiliate which is a creditor in this case, General Electric International, Inc. ("GEII"), is not, and never has been, a client of DLA Piper, but instead is a

client of DLA Piper International, LLP ("DLA Piper International"), a separate affiliate of DLA

Piper.  (*Id.*)

Walsh's second declaration (the "Supplemental Walsh Declaration") further explains the

relationship between DLA Piper and DLA Piper International.  (ECF # 84.)  DLA Piper and

DLA Piper International are the two components of DLA Piper Global, a Swiss verein entity.[2]

The Supplemental Walsh Declaration claims that GEII is technically a client of Advokafirma

DLA Piper Norway DA, which is a limited partner in DLA Piper International.  Walsh argues

that as a result DLA Piper receives no financial benefit from the work DLA Piper International

and its components complete for GEII.  (Supplemental Walsh Declaration at ¶¶ 2–3.)

The Walsh Declarations also state that DLA Piper has represented, and may currently

represent, numerous other potential parties in interest including Syracuse University, AECOM,

National Grid, JP Morgan Chase, U.S. Bank, City of Syracuse, Chartis National Union Fire

Insurance Company of Pittsburgh, PA., and BP Energy Company (together with GEII, the

"Conflict Parties").  (Initial Walsh Declaration at ¶ 8; Schedule 2 to Initial Walsh Declaration.)

Walsh's Supplemental Declaration clarifies that DLA Piper may be adverse to Syracuse

University.  (Supplemental Walsh Declaration at ¶¶ 2–3.)  Walsh further reveals that the Conflict

Parties, with the exception of GE, represent less than 1% of the revenues generated by DLA

Piper in 2008, 2009, and to date in 2010.  (Initial Walsh Declaration at ¶8 n.5.)  Walsh also

notes, however, that DLA Piper's work for GE entities constituted .92% of revenue in 2008,

1.6% of revenue in 2009, and has accounted for .90% of revenues to date in 2010.  (*Id.* n.6.)

---

[2]      A Swiss verein is essentially an incorporated membership association, but has no precise counterpart in the
United States. *In re Lernout & Hauspie Secs. Litig.*, 230 F. Supp. 2d 152, 171 (D. Mass. 2002); Megan E. Vetula,
*From the Big Four to Big Law:  The Swiss Verein and the Global Law Firm*, 22 GEO. J. LEGAL ETHICS 1177, 1180
(2009).

Walsh's third declaration (the "Second Supplemental Walsh Declaration"), filed after the

June 7, 2010 hearing on this motion, clarifies that DLA Piper would not sue certain Conflict

Parties, specifically AECOM, Chartis National Union Fire Insurance Company of Pittsburgh,

PA., BP Energy Company, and GEII.  (Second Supplemental Walsh Declaration at Ex. A. (ECF

# 101).)

The DLA Employment Application acknowledges that DLA Piper's relationship with GE

gives rise to a conflict.  (DLA Employment Application at ¶ 19.)  At the June 7, 2010 hearing on

the DLA Employment Application, DLA Piper affirmed its conflict with GE.  (June 7, 2010 Tr.

55:23–56:5 ("The Court:  . . . .  Don't you agree you have a conflict [with GE]?  Mr. Walsh:  I

do.").)  Following the June 7, 2010 hearing, however, DLA Piper retreated from its position, and

now argues that it has no conflict of interest in representing the Debtor.  (Supplement to

Application of Debtor for Order Authorizing Employment and Retention of DLA Piper LLP

(US) ("DLA Supplemental Brief") at 2 (ECF # 102).)  Notably, DLA Piper does not maintain

that it doesn't have a conflict with GE.  In fact, the Debtor has retained Golenbock Eisenman

Assor Bell & Peskoe LLP ("Golenbock") to handle all matters for which DLA Piper cannot

adequately represent the Debtor, including issues regarding GEII.  (*See* Order Granting

Application to Employ Golenbock as Conflicts Counsel, ECF # 106.)

Despite DLA Piper's current position, its relationship with GE caused it sufficient

concern that it obtained a conflict waiver from GE to shield it from allegations of ethical

wrongdoing (the "Conflict Waiver").  (*See* U.S. Trustee's Objection at ¶¶ 30–31.)  A copy of the

Conflict Waiver is attached as an Exhibit to the Supplemental Walsh Declaration.  (*See* ECF #

84.)  The Conflict Waiver is contained in a letter from DLA Piper, not DLA Piper International,

and is addressed to GEII, care of senior general counsel for GE.  The Conflict Waiver states that

DLA Piper "will not bring any litigation or threaten any litigation for the recovery of monetary

damages from GE or its affiliates or for any equitable relief against GE or any of its affiliates."

(Conflict Waiver at 1.)  The Conflict Waiver, however, would permit DLA Piper to

> (a) negotiate with GE on all matters, and (b) review loan, lease or other
> documents relating to the prepetition credit facilities or lease; provided,
> however that [the Debtor] has engaged special counsel of its own choosing
> . . . with respect to the potential of bringing or prosecuting any such
> adversary proceeding or contested matter against GE . . . .

(Conflict Waiver at 1–2.)  Lastly, the Conflict Waiver indicates that DLA Piper may take

positions regarding relief from the automatic stay, use of cash collateral, DIP financing, or

confirmation of a plan that differ from that of GE "except to the extent that any such position

taken by [the Debtor] may not be more inconsistent with any provision of any intercreditor

agreement."  (Conflict Waiver at 2.)  DLA Piper claims that no such intercreditor agreement

exists.  (DLA Piper's Resp. to U.S. Trustee's Obj. at ¶ 7.)

## II.  DISCUSSION

### A.    Retention of Professionals under Section 327(a) of the Bankruptcy Code

Section 327(a) of the Bankruptcy Code permits a debtor in possession to employ

professionals to represent the estate during bankruptcy with court approval.  *In re Worldcom,*

*Inc.*, 311 B.R. 151, 163 (Bankr. S.D.N.Y. 2004).  The statute reads:

> Except as otherwise provided in this section, the trustee, with the court's
> approval, may employ one or more attorneys, accountants, appraisers,
> auctioneers, or other professional persons, that do not hold or represent an
> interest adverse to the estate, and that are disinterested persons, to
> represent or assist the trustee in carrying out the trustee's duties under this
> title.

11 U.S.C. § 327(a).  Professionals must be both disinterested and not hold or represent any

interest adverse to the estate to be employed under section 327(a).  *Vouzianas v. Ready &*

*Pontisakos (In re Vouzianas)*, 259 F.3d 103, 107 (2d Cir. 2001) (citing *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621 (2d Cir. 1999)).

The structure of the Bankruptcy Code distills these dual requirements into a single test for analysis of a conflict of interest. Bankruptcy Code § 101(14) defines a "disinterested person." *In re Worldcom*, 311 B.R. at 164. Under section 101(14)(C) a disinterested person is one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors" for any reason. 11 U.S.C. § 101(14)(C). This definition overlaps with the adverse interest requirement of section 327(a), creating a single test for courts to employ when examining conflicts of interest. *Hogil Pharm. Corp. v. Sapir (In re Innomed Labs, LLC)*, No. 07 Civ. 4778(WCC), 2008 WL 276490, at *2 (S.D.N.Y. Jan. 29, 2008) (citing *In re Worldcom*, 311 B.R. at 164). A professional must not "hold or represent an interest adverse to the estate." *See In re AroChem Corp.*, 176 F.3d at 622–23 (observing that the "adverse interest" language appears in section 327(a) and in the definitions in section 101 regarding disinterested persons and articulating the relevant test as whether an entity "hold[s] or represent[s] an interest adverse to the estate"); *In re Innomed Labs, LLC*, 2008 WL 276490, at *2 (same). *See also In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (observing that "the two prongs of section 327(a) are duplicative and form a single test to judge conflicts of interest") (internal citation omitted).

The Second Circuit has defined "hold or represent an adverse interest" as

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re AroChem Corp.*, 176 F.3d at 623 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987)). The

prohibition on adverse interests includes "economic and personal interests of an attorney." *See*

*In re Mercury*, 280 B.R. 35, 54 (Bankr. S.D.N.Y. 2002) (citation omitted). The test is not

retrospective; courts only examine present interests when determining whether a party has an

adverse interest. *In re AroChem*, 176 F.3d at 623–24 (observing that Congress intended only to

proscribe those who presently have an adverse interest from representing a debtor under section

327(a)). Generally stated, the adverse interest test is objective and excludes "any interest or

relationship, however slight, that would even faintly color the independence and impartial

attitude required by the Code and Bankruptcy Rules." *In re Granite Partners*, 219 B.R. at 33;

s*ee also In re Angelika Films 57th*, 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination

of adverse interest is objective and is concerned with the appearance of impropriety.")

Courts determine whether an adverse interest exists on a case-by-case basis, examining

the specific facts in a case. *In re AroChem Corp.*, 176 F.3d at 623 ("Whether an adverse interest

exists is best determined on a case-by-case basis."); *In re Angelika Films 57th*, 227 B.R. at 39

(stating that "the determination of counsel's disinterestedness is a fact-specific inquiry").

Bankruptcy courts may consider the interests of the estate and the debtor's creditors, accounting

for the expeditious resolution of a case when analyzing a retention order. *In re Vouzianas*, 259

F.3d at 107 (quoting *In re Arochem*, 176 F.3d at 621). Courts, however, must take the

requirements of section 327 seriously, as they ensure that a professional fulfils his duties in

accordance with his fiduciary duties to the estate. *In re Leslie Fay Cos.*, 175 B.R. 525, 532

(Bankr. S.D.N.Y. 1994) ("The requirements of section 327 cannot be taken lightly, for they

'serve the important policy of ensuring that all professionals appointed pursuant to [the section]

tender undivided loyalty and provide untainted advice and assistance in furtherance of their

fiduciary responsibilities.'") (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)).

Moreover, courts lack the power to authorize the "employment of a professional who has a conflict of interest." *In re Mercury*, 280 B.R. at 55.

Congress has explicitly stated that a professional's representation of a creditor in another case does not automatically disqualify it from being retained under section 327. *See* 11 U.S.C. § 327(c) ("a person is not disqualified for employment under this section solely because of such person's employment or representation of a creditor"). The statute, however, *requires* disqualification of a professional following an objection from the U.S. Trustee or a creditor where there is an actual conflict of interest. *Id.* ("the court shall disapprove such employment if there is an actual conflict of interest"). Section 327(c) acknowledges the difficulties debtors have in large chapter 11 bankruptcies to retain competent attorneys with the resources to handle the scope of the cases. *See* 3 COLLIER ON BANKRUPTCY ¶ 327.04[7][b] (15th ed. rev. 2010). The statute "prevents disqualification based *solely* on the professional's prior representation of or employment by a creditor" but does not obviate the essential requirement that a professional not have an interest adverse to the estate. *In re Arochem*, 176 F.3d at 621 (quoting *In re Interwest Bus. Equip.*, 23 F.3d 311, 316 (10th Cir. 1994)). Thus, even where section 327(c) is applicable, if a court determines that there is an actual conflict of interest following an objection from the U.S. Trustee or a creditor the court must disapprove the employment.

## B.     DLA Piper's Relationship with GE Precludes it from Being Employed by the Debtor Under § 327(a)

DLA Piper attempts to distance itself from GE, maintaining that the creditor in this case, GEII, is not even a client of DLA Piper, but rather a client of DLA Piper International. (Initial Walsh Declaration at ¶ 8; Supplemental Walsh Declaration at ¶¶ 2–3.) But the Conflict Waiver severely undermines DLA Piper's effort to segregate its relationship to GEII. Specifically, the Conflict Waiver was sent by DLA Piper, not DLA Piper International. Moreover, it is addressed

to GEII "care of" an attorney at GE itself.  Lastly, the Conflict Waiver combines GEII and GE

into a single entity, GE, when requesting a waiver.  Thus, the Court does not accept DLA Piper's

effort to draw artificial lines in an attempt to isolate itself from GEII.  As DLA Piper's Conflict

Waiver conflates GE and GEII as a single entity, this Court too will treat them as one and the

same for purposes of this motion.[3]

     Using this approach the U.S. Trustee argues that DLA Piper's ongoing relationship with

GE precludes it from being retained as general bankruptcy counsel in this matter.  (U.S. Trustee

Obj. at 1–2, 14.)  Indeed, the Debtor and DLA Piper agree that DLA Piper cannot represent the

Debtor in many matters regarding GE.  Specifically, the DLA Employment Application admits

that DLA Piper is conflicted from taking certain actions in the bankruptcy due to its

representation of GE affiliates.  (*See* DLA Employment Application at ¶ 19.)  And, during the

hearing on the retention application, counsel for DLA Piper confirmed the presence of a conflict

with GE.  (June 7, 2010 Tr. 55:23–56:5.)  DLA Piper's Supplemental Brief also confirms the

presence of conflict between the DLA Piper and GE.  (DLA Supplemental Brief at 2 ("no

conflict will exist between DLA Piper and GE going forward after a settlement is finalized

regarding the turbine").)

---

[3]    Since DLA Piper dealt with itself and its affiliates as one entity in negotiating a conflict waiver with GE
entities (likewise treated as one entity), the Court does not need to consider whether different conflicts rules might
apply in some circumstances where international law firms share a relationship through a Swiss verein.  DLA
Piper's website proclaims that "DLA Piper became one of the largest legal service providers in the world in 2005
through a merger of unprecedented scope in the legal sector.  While large in scale, the merger strategy was simple –
to create an international legal practice capable of taking care of the most important legal needs of clients wherever
they do business. . . .  DLA Piper today has 3,500 lawyers in offices throughout Asia, Europe, the Middle East and
the United States.  We represent more clients in a broader range of geographies and practice disciplines than
virtually any other law firm in the world."  *See* http://www.dlapiper.com/global/about/overview/ (last visited June
23, 2010).  DLA Piper holds itself out to the world as one firm, although it now tries to separate itself into separate
firms for conflicts purposes.  Followed to its logical conclusion, this would lead to the anomalous result that DLA
Piper, on behalf of one client, could be adverse to DLA Piper International, on behalf of one of its clients, without
violating ethical standards.

Despite this acknowledged conflict, DLA Piper argues that it "does not have a conflict of interest in representing the Debtor." (*Id.* at 2.) It is only barred from acting in "litigation directly adverse to GE" and it has "no conflict with representing the Debtor opposite GE in developing and negotiating a plan of reorganization." (DLA Piper's Resp. to U.S. Trustee's Obj. at 1–2.) In support of this position, DLA Piper argues that the Court should focus "on the actions DLA Piper proposes to take as to [Project Orange] in this bankruptcy case" and eschew DLA Piper's other relationships. (*See* DLA Supplemental Brief at 3.) DLA Piper apparently believes that the Stipulation with GE—which would provide for the eventual return of Turbine components to the Debtor, but not resolve GE's unsecured claim against the estate—combined with the Conflict Waiver and its use of conflicts counsel somehow permits DLA Piper to represent the Debtor as general bankruptcy counsel despite its close relationship and acknowledged conflict with GE. The Court disagrees with DLA Piper's assessment of the law.

      1. *The Debtor's Execution of the Stipulation did not Resolve DLA Piper's Conflict with GE*

DLA Piper argues in its Supplemental Brief—filed after the Debtor entered into the Stipulation with GE—that the Debtor's signing of the Stipulation resolved all conflicts between itself and GE. (DLA Supplemental Brief at 2.) DLA Piper is severely mistaken. The Stipulation, by its own terms, is not effective until this Court reviews the Stipulation in accordance with Federal Rule of Bankruptcy Procedure 9019 and approves the settlement. (Stipulation at ¶ 1.) Until then, no settlement exists and GE remains directly adverse to Project Orange. Notably, even if the Court approves the Stipulation, adversity would still remain. Under the terms of the settlement, GE must complete repairing a Turbine component before it can install the Turbine in accordance with other Stipulation provisions. Repairs on the component are anticipated to be completed by July 10, 2010, but the Stipulation states that this

date is subject to change.  If repairs are more difficult than anticipated, the return of the Debtor's

Turbines to operation is not assured.  Moreover, there would likely be contentious litigation over

the installation of the Turbines.  As summer is the Debtor's busiest months, any delay on GE's

part would almost necessitate the Debtor to threaten a lawsuit to expedite the repair and

installation process.  Indeed, until the repair and installation of the Turbines is complete, GE and

Project Orange remain wholly adverse.

Moreover, Project Orange is locked in highly contentious—but currently stayed—

litigation in state court with its landlord, Syracuse University, regarding the validity of their

lease.  The University maintains that the lease was terminated prepetition as a result of several

Project Orange defaults.  Under the terms of the Debtor's lease with the University, arguments

exist that termination of the lease would result in the entire Facility reverting to the University:

Section 27.02(b)(ii) of the lease specifically allows the University to repossess both the leased

property as well as the Facility on termination of the lease.  As defined in other agreements

between the two parties, the Facility includes the Turbines.  Thus, even if the Stipulation and

settlement become effective, if Syracuse University is successful in establishing that the lease

terminated prepetition, Project Orange will have no assets to liquidate to pay its largest

unsecured creditor.

DLA Piper, however, ignores these clear conflicts, suggesting that the Stipulation

resolved all adversity in this case.  DLA Piper cites to cases that distinguish between present and

potential conflicts, arguing that because only the *potential* for adversity with GE exists, it may be

retained in this case.  But other bankruptcy judges in this district have refused to distinguish

between actual and potential conflicts.  *In re Angelika Films 57th*, 227 B.R. at 39 ("The

distinction between 'potential' and 'hypothetical' conflicts merely confuses the analysis, and

several courts have rejected it as artificial."); *In re Granite Partners*, 219 B.R. at 33 ("The distinction [between actual and potential conflicts] often seems artificial, and some courts have rejected it."). These judges instead focus on the facts of each case to determine whether an attorney has an adverse interest without limiting labels. *See, e.g.*, *In re Leslie Fay Cos.*, 175 B.R. at 532–33 (rejecting the actual/potential dichotomy and observing that courts should focus on the facts of a case when reviewing retention applications).

Even if the Court ignores the disfavored actual/potential distinction, the cases cited by DLA Piper fail to persuade the Court that DLA Piper has no disabling conflict of interest with GE. Indeed, the two cases DLA Piper most heavily relies upon are easily distinguishable from the present case. In *In re Rockaway Bedding, Inc.*, No. 07-14890, 2007 WL 1461319 (Bankr. D.N.J. May 14, 2007), the court determined that a law firm that represented a debtor's biggest secured creditor in unrelated matters could be the debtor's general bankruptcy counsel. Central to the court's decision was the fact that there was no ongoing litigation between the debtor and the secured creditor and no such litigation was envisioned. *See id.* at *3–4 ("The Debtors are not in any active litigation against [secured creditor] or any other creditor . . . and the Court is advised that no such litigation is envisioned."). Similarly, in *In re Dynamark, Ltd.*, 137 B.R. 380 (Bankr. S.D. Cal. 1991), the court approved the retention of an attorney as general bankruptcy counsel who represented the estate's largest secured creditor in unrelated matters, finding no outstanding litigation between the parties. *See id.* at 381 ("it appears that no actual conflict or adverse interest has surfaced in this case so far"). In stark contrast, here the Debtor had litigation pending with GE, DLA Piper's client, before the bankruptcy was even filed. The Debtor and GE are still directly adverse, as the Stipulation has not yet been approved by the Court. Moreover,

15

enforcement and performance of the Stipulation will continue to place the Debtor and GE

directly at odds and could well give rise to new litigation.

   2.   *DLA Piper's Conflict Waiver Does Not Permit DLA Piper's Employment Under
        327(a)*

The Conflict Waiver does not save DLA Piper's application from these infirmities.  Both

commentators and courts conclude that disabling adverse interests may exist where the

professional to be retained also represents creditors of the debtor.  *In re American Printers &*

*Lithographers, Inc.*, 148 B.R. 862, 865–66 (Bankr. N.D. Ill. 1992) (finding adverse interest

between debtor's proposed law firm and the debtor's secured creditor based on law firm's

continuing representation of secured creditor in unrelated matters); 2 NORTON BANKRUPTCY LAW

AND PRACTICE 3D §30:5 (3d ed. 2010) (observing that the "most common areas in which

conflicts arise are where the professional also represents . . . creditors of the debtor").  Indeed, in

*American Printers*, the court concluded that a conflict existed because debtor's proposed

counsel, who represented a secured creditor of the debtor in unrelated matters, could not

negotiate with the secured creditor on the debtor's behalf.   Thus, the proposed attorney was

disqualified.  *See In re American Printers*, 148 B.R. at 865–66.  Here, DLA Piper contemplates

engaging in the *exact conduct* the *American Printers* court determined created a disabling

conflict between proposed counsel and the debtor's secured creditor—"developing and

negotiating a plan of reorganization."[4]  (DLA Piper's Resp. to U.S. Trustee's Obj. at ¶ 7.)

---

[4]     DLA Piper's attorneys have also shown that they are tone-deaf when it comes to conflicts issues.  During
the June 7, 2010 hearing, counsel presented a proposed settlement between the Debtor and BP regarding the delivery
of natural gas needed to operate the Debtor's Turbines.  No objections were filed to the proposed settlement.  The
Court indicated that it would approve the settlement.  Later in the hearing, however, almost in passing, counsel
acknowledged that it could not be adverse to BP, an existing client of DLA Piper.  The U.S. Trustee then questioned
how DLA Piper could negotiate and present the settlement if it cannot be adverse to BP.  Counsel then responded
that it had identified BP as a conflict party in exhibits to its retention application, as if the disclosure could cure the
conflict.  The Court withdrew its approval of the settlement, which has since been resubmitted by Golenbock,
Debtor's conflict counsel.  Identifying conflicts does not involve a game of "gotcha," where disclosure of a conflict
party in one schedule excuses counsel from the consequences of a conflict if no one finds the earlier disclosure and
objects.

DLA Piper argues that because GE has contractually permitted DLA Piper to represent the Debtor on some matters adverse to GE that it cures *all* conflicts for purposes of section 327(a).  But an agreement between DLA Piper and GE, *i.e.*, the Conflicts Waiver, cannot trump the requirements of section 327(a).  Even if GE agreed that DLA Piper could act against GE on all issues, through litigation, negotiation or otherwise, DLA Piper must still satisfy the statutory requirements of section 327(a) to be retained as general bankruptcy counsel.  *See, e.g.*, *In re Granite Partners, L.P.*, 219 B.R. at 34 (observing that while clients may, in some instances, waive conflicts, "the mandatory provisions of section 327(a) do not allow for waiver"); *In re Perry*, 194 B.R. 875, 880 (E.D. Cal. 1996) (stating that "section 327(a) has a strict requirement of disinterestedness and absence of representation of an adverse interest which trumps the rules of professional conduct").

Moreover, the Conflict Waiver severely limits DLA Piper's ability to act in the best interests of the Debtor with regards to GE.  Under the terms of the Conflict Waiver, DLA Piper is barred from both bringing suit and threatening to bring suit against GE or its affiliates for monetary damages or equitable relief.  (Conflict Waiver at 1.)  While the Conflict Waiver purportedly allows DLA Piper to negotiate with GE "on all matters" and review loan or lease documents relating to the Debtor's prepetition credit facilities and lease, the Court does not believe that DLA Piper can negotiate with full efficacy without at least being able to hint at the possibility of litigation.  *In re American Printers & Lithographers, Inc.*, 148 B.R. at 865–66 ("Debtor's counsel must at least vigorously negotiate . . . in order to fulfill its duties to Debtor, even if litigation is not warranted.").

This is particularly true with regards to the Stipulation.  The Debtor's ongoing relationship with GE is a core issue for a successful reorganization of the Debtor.  Specifically,

return of the Turbines to operation is central to the Debtor's profitability.  (*See* May 3, 2010 Tr. at 15–16, 19 ("Mr. Victor:  Nobody's going to get paid unless we can run [both Turbines] and let . . . us see how we can maximize [them].").)  Yet, as indicated above, under the Stipulation there is a possibility that the installation date of the Turbines may slip.  If this occurs, Project Orange will be forced to quickly and vigorously negotiate the installation schedule to take advantage of the summer electricity season.  Valid negotiation strategies may include threatening lawsuits or withholding  payments to be made under the Stipulation.  It is unclear whether the Conflict Waiver would permit DLA Piper to take either course of action.

   *3. The Debtor's Use of Conflicts Counsel Does Not Warrant DLA Piper's Employment Under 327(a)*

   In many cases, the employment of conflicts counsel to handle issues where general bankruptcy counsel has an adverse interest solves most questions regarding the retention of general bankruptcy counsel.  Indeed, DLA Piper has identified cases where courts determined that the use of conflicts counsel could insulate proposed counsel from hypothetical and speculative conflicts that may arise in the course of a bankruptcy case with entities that are not central to the debtor's reorganization efforts.  *See, e.g.*, *In re Enron Corp.*, No. 01-16034(ALG), 2002 WL 32034346, at *9–10 (Bankr. S.D.N.Y. May 23, 2002) (refusing to disqualify law firm on mere speculation that it had an adverse interest and finding that use of conflicts counsel was appropriate to handle certain limited investigations where firm had an adverse interest).  But DLA Piper has not provided the Court with any case law indicating that the use of conflicts counsel warrants retention under section 327(a) where the proposed general bankruptcy counsel has a conflict of interest with a creditor that is central to the debtor's reorganization.  The Court determines that this is such a case where the use of conflicts counsel does not allow the retention of the Debtor's chosen counsel under section 327(a).

Even if Golenbock performed *all* work related to GE in this case, the fig leaf of conflicts counsel does not convince the Court that retention of DLA Piper as general bankruptcy counsel is appropriate in these circumstances.  As previously indicated, GE is central to this case.  It is the Debtor's largest unsecured creditor.  The return and installation of the Turbines, which are central to the Debtor's ability to reorganize, is currently subject to a Stipulation which may or may not be entered by the Court.  Moreover, even if the Court approves the Stipulation, there is considerable uncertainty regarding the timeline for installation of the Turbines.  Any disagreement on installation would likely give rise to highly contentious proceedings.  In fact, GE has shown its willingness to vigorously defend itself in this forum by making multiple filings.  GE has moved the Court to lift the automatic stay to confirm its $4.1 million arbitration award.  (ECF # 13.)  GE has also objected to the Debtor's request to pay prepetition wages, salaries, and taxes.  (ECF # 15.)  GE has further filed a motion to lift the automatic stay with regards to two checks issued by AIG to both the Debtor and GE.  (ECF # 64.)  Given GE's strong interests and active stance in this case, it is clear that addressing issues with GE will take considerable time and skill on a range of matters.  Indeed, the Debtor essentially acknowledged that Golenbock would need to take numerous actions in this case by seeking to retain the firm pursuant to section 327(a) of the Bankruptcy Code and not the more limited "special purpose" contemplated by section 327(e).  Thus, even assuming DLA Piper does not complete *any* work regarding GE, the Court does not believe DLA Piper's employment is permissible.

Other courts have determined that where proposed counsel is conflicted from representing a debtor with regards to matters central to the bankruptcy, even the presence of conflicts counsel does not make the retention appropriate.[5]  In *In re Amdura Corp*, 121 B.R. 862

---

[5]    The Court is surprised at the dearth of precedent on this point.  In addition to the case law discussed in this Opinion, at least one commentator concurs with the Court's assessment in an analogous setting.  *See* Susan M.

(Bankr. D. Colo. 1990), the court examined an attempt to use conflicts counsel to enable an otherwise conflicted general bankruptcy counsel to be retained under section 327(a).  Winston & Strawn ("Winston") sought to represent the debtor.  The primary creditor in the case, Continental Bank ("Continental"), had loaned the debtor $215 million.  *Id.* at 866.  Winston previously represented—and continued to represent—Continental during the bankruptcy in unrelated matters.  Winston stated that it could not investigate the loan Continental made to the debtor but an examiner could be appointed to do so.  Winston further stated that, to the extent the debtor needed to sue Continental, it could use separate counsel.  *Id.* at 867.  The court found that Winston's inability to be adverse to Continental constituted a conflict of interest disallowing its retention under section 327(a).  *Id.*  The court further found that this conflict could not be resolved through the use of separate counsel.  While theorizing that the use of conflicts counsel may resolve conflicts issues where proposed general counsel previously represented smaller creditors whose interests were not central to the resolution of the case, the court concluded that because resolution of issues with Continental could be the "lynch-pin of the case," Winston had a conflict that could not be resolved through the use of alternative counsel.  The court specifically questioned Winston's ability to adequately advise the debtor in negotiations with Continental and draft a plan of reorganization.  *Id.*

DLA Piper argues that *Amdura* is distinguishable because "DLA is willing and able if necessary to take positions opposed by [GE] and advance a plan of reorganization that is in the best interests of the Debtor."  (*See* DLA Piper's Resp. to U.S. Trustee's Obj. at ¶ 9.)  This argument erroneously assumes that DLA Piper can contractually obviate the mandatory

---

Freeman, *Are DIP and Committee Counsel Fiduciaries for their Clients' Constituents or the Bankruptcy Estate? What is a Fiduciary Anyway?*, 17 AM. BANKR. INST. L. REV. 291, 367 (2009) ("Courts have allowed . . . counsel to avoid the lack of disinterestedness or existence of an adverse interest caused by the role of other firm clients in the bankruptcy case by appointing special counsel to deal with all matters adverse to the other clients.  If a creditor client's role is central to the case, such as carve-out of . . . representation may be infeasible.") (footnotes omitted).

requirements of section 327(a) with its Conflict Waiver.  *See, e.g.*, *In re Granite Partners, L.P.*, 219 B.R. at 34 (stating that "the mandatory provisions of section 327(a) do not allow for waiver").  Moreover, this case shares much in common with *Amdura*:  in both cases, proposed counsel could not investigate and prosecute claims against the key creditor in the case; in both cases, the conflict existed with the largest creditor and raised issues central to the resolution of the bankruptcy case.  As in *Amdura*, it does not appear that DLA Piper can "fairly and fully advise" in the negotiation and drafting of a plan when it may not even be able to advocate litigation against GE.  *In re Amdura Corp*, 121 B.R. at 867.

Similarly, in *In re Git-N-Go, Inc.*, 321 B.R. 54 (Bankr. N.D. Okla. 2004), the bankruptcy court reviewed an employment application under section 327(a).  The proposed counsel was intimately involved with a holding company ("Holding Company") central to the bankruptcy. The relationship between the Holding Company and proposed counsel had lasted for decades and the parties intended to continue the arrangement following the bankruptcy case.  *Id.* at 57.  The Holding Company owned 87% of the debtor's stock and the debtor was forced to file for bankruptcy in part due its relationship with a wholly owned subsidiary of the holding company, 4 Front Petroleum, Inc. ("4 Front").  4 Front purchased gas from Citgo and resold the gas to the debtor, who in turn sold the gas to consumers.  Citgo, however, withheld hundreds of thousands of dollars in the debtor's gas sales to set off against debt 4 Front owed to Citgo.  Despite the bankruptcy, Citigo continued to withhold and set off the debtor's gas sales.  *Id.* at 57–58.  Proposed counsel disclosed that it represented Citgo in unrelated matters and that Citgo accounted for approximately 1% of its revenues from the previous years.  While proposed counsel had a waiver from Citgo allowing it to contest Citgo's withholding of gas sales from the debtor, it never did so and instead counseled the debtor to retain alternative counsel to challenge

Citgo's actions. *Id.* at 58. The court determined that proposed counsel's relationship with the

Holding Company and Citgo created conflicts of interest. *Id.* at 59, 61 (concluding that due to its

relationship with the Holding Company, its subsidiaries and Citgo, Proposed Counsel "cannot

provide the objective and independent advice . . . required for the Debtor's performance of its

fiduciary obligations"). With respect to proposed counsel's conflict with the Holding Company,

the court determined that substituting the creditors' committee in its stead would not resolve the

conflict. The court reasoned that investigating potential causes of action against the Holding

Company was "among the primary duties assigned to the debtor in possession, and . . . cannot

simply be delegated to a creditors' committee when the debtor's counsel is unavailable because

representation of the estate would implicate an adverse interest." *Id.* at 60–61. As to proposed

counsel's conflict with Citgo, the court determined that proposed counsel's refusal to be directly

adverse to Citgo could not be cured by the use of conflicts counsel. The court reasoned that

conflicts counsel would need to represent the debtor in "core bankruptcy matters" and it would

not be "appropriate or in the best interests of the estate" to use conflicts counsel to conduct the

duties of general bankruptcy counsel. *Id.* at 61–62.

DLA Piper attempts to distinguish *Git-n-Go*, arguing that unlike the case at bar proposed

counsel in *Git-n-Go* (i) represented both the debtor and "several" adverse parties; (ii) admitted it

was ethically incapable of acting as counsel for the debtor in certain circumstances; and (iii)

represented parties in interest in matters regarding the debtor prior to the petition date. (DLA

Piper's Resp. to U.S. Trustee's Obj. at ¶ 10.) DLA Piper's distinctions fail. As an initial matter,

proposed counsel in *Git-n-Go* only represented two parties in interest in the case prior to the

petition date, the Holding Company and Citgo. *In re Git-N-Go, Inc.*, 321 B.R. at 56–58. The

court found that both of these relationships created conflicts. *Id.* at 60–62. The conflict with the

Holding Company could not be resolved by having the creditors' committee investigate potential claims against a creditor. *Id.* at 60–61. Nor could the conflict with Citgo be resolved through the use of conflicts counsel. *Id.* at 61–62. DLA Piper misreads *Git-N-Go*, implying that the fact that proposed counsel represented Citgo with regards to matters pending in the bankruptcy before the petition date was dispositive to the court's decision. (DLA Piper's Resp. to U.S. Trustee's Obj. at ¶ 10 ("unlike the firm involved in *Git-N-Go*, prior to the Petition Date, the only party in interest that DLA represented in matters involving the Debtor was the Debtor").) Rather, the court found that it was proposed counsel's unwillingness to represent the debtor in its dispute with Citgo that created a conflict of interest that could not be resolved through the use of other counsel. *In re Git-N-Go, Inc.*, 321 B.R. at 60–61 (observing "the fact that [proposed counsel] is unable or unwilling to represent the [d]ebtor in its dispute with Citgo also creates an actual disqualifying conflict of interest" which cannot be cured through the use of conflicts counsel). In fact, proposed counsel in *Git-N-Go* only represented Citgo in matters *unrelated* to the debtor. *Id.* at 58. Here, just as in *Git-N-Go*, DLA Piper represented GE prior to the petition in matters unrelated to the Debtor and is unable to take certain actions against GE pursuant to the Conflict Waiver.

Finally, the bankruptcy court in *In re Envirodyne Indus., Inc.*, 150 B.R. 1008 (Bankr. N.D. Ill. 1993), analyzed a similar situation. The court analyzed a motion to vacate an order authorizing the employment of Cleary, Gottlieb, Steen & Hamilton ("Cleary"). *Id.* at 1011. Cleary had represented an investment bank, Salomon Brothers, Inc. ("Salomon"), in connection with a leveraged buy-out ("LBO") of the debtor. Salomon owned nearly two-thirds of the entity that purchased the debtor and held a majority of seats on the debtor's board of directors. Salomon was also a creditor of the debtor. After the LBO was completed Cleary represented the

debtor in most matters requiring outside counsel, including two bond issues—both underwritten

by Salomon—and in structuring a loan from Salomon to the debtor.  Cleary also advised the

debtor on debt restructuring and the possibility of seeking chapter 11 protection.  *Id.* at 1011–12.

When restructuring talks began counsel for a committee of ad hoc bondholders began

investigating causes of action related to the LBO.  Cleary counseled Salomon to seek other

attorneys to represent it with regards to these possible claims.  *Id.* at 1012.  Cleary, however,

continued to represent Salomon in unrelated matters.  *Id.* at 1013.  Cleary argued that it could

represent the debtor because it would not pursue an action against Salomon for claims arising out

of the LBO and noted that any such action was a "remote contingency."  *Id.* at 1019.  The court

rejected Cleary's position, stating that Cleary had an "affirmative duty to investigate potential

claims" and that its characterization of a potential lawsuit as "remote" revealed that Cleary had

already made a determination regarding the pursuit of claims against Salomon.  *Id.*

DLA Piper's retention application suffers from the same issues faced by Cleary in *In re*

*Envirodyne*.  Like Cleary, DLA Piper argues it is "disinterested" for purposes of the Bankruptcy

Code because it will not bring litigation against GE and because the Stipulation has allegedly

resolved all disputes between the Debtor and GE.  (*See* DLA Piper's Resp. to U.S. Trustee's Obj.

at ¶ 7; *see also* DLA Supplemental Brief at 2.)  Also like Cleary, DLA Piper seemingly assumes

that developing and negotiating a plan of reorganization will not make it directly adverse to GE.

(*See* DLA Piper's Resp. to U.S. Trustee's Obj. at ¶ 7; *see also* DLA Supplemental Brief at 2.)

And just like Cleary, DLA Piper's assumption that it is not conflicted in developing a plan

reveals that it has already made a determination regarding the status of matters with GE,

specifically with regards to the Stipulation and the resolution of GE's unsecured claim.

Prejudging the status of matters with a debtor's largest unsecured creditor, as the *Envirodyne* court noted, is not consistent with the Debtor's duty to investigate all possible claims.

On the facts of this case, as DLA Piper's conflict is with the Debtor's largest unsecured creditor that is central to the issues in this case, the Court concludes that it is inappropriate to approve the retention application. It is not a sufficient answer, as DLA Piper posits, that the firm has had a long-standing relationship with the Debtor. Conflicts rules do not apply only when application of the rules will not inconvenience the party seeking to retain conflicted counsel.

## CONCLUSION

DLA Piper's representation of GE creates a conflict of interest with the Debtor. GE is the largest creditor in this case, has been highly active in the proceedings, and is certain to play a key role in any plan negotiations or confirmation hearing. Here, given DLA Piper's admitted conflict of interest with GE and GE's central role in this case, the Court does not believe that the use of conflicts counsel warrants DLA Piper's retention in this matter. Thus, the DLA Employment Application is **DENIED**.

**IT IS SO ORDERED.**

DATED:      June 23, 2010
            New York, New York

　　　　　　　　　　　　　**/s/Martin Glenn**
                    MARTIN GLENN
            United States Bankruptcy Judge