UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                               :
In re:                                         :        Chapter 11
                                               :
PROJECT ORANGE ASSOCIATES, LLC,                :        Case No. 10-12307 (MG)
                                               :
                    Debtor.                    :
                                               :
---------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER GRANTING SYRACUSE UNIVERSITY'S MOTION TO LIFT THE AUTOMATIC STAY AND DENYING MOTION TO DISMISS

*A P P E A R A N C E S:*

BOND, SCHOENECK & KING, PLLC
*Attorneys for Syracuse University*
One Lincoln Center
Syracuse, New York 13202
By:   Joseph Zagraniczny, Esq.
        Jonathan B. Fellows, Esq.

DLA PIPER LLP (US)[1]
*Proposed Attorneys for the Debtor and Debtor in Possession*
1251 Avenue of the Americas
New York, New York 10020-1104
By:   Timothy W. Walsh, Esq.
        Christopher R. Thompson. Esq.

HISCOCK & BARCLAY LLP
*Attorneys for Niagara Mohawk Power Corporation*
One Park Place
300 South State Street
Syracuse, New York 13202
By:     Susan R. Katzoff, Esq.

---

[1]      Subsequent to the hearing on this motion, the Court sustained the United States Trustee's Objection to the Debtor's application to retain DLA Piper LLP (US). *In re Project Orange Assocs. LLC*, No. 10-12307(MG), 2010 WL 2521073 (Bankr. S.D.N.Y. June 23, 2010). (ECF # 126.)  The Debtor's Application to Retain Klestadt & Winters, LLP as counsel is scheduled to be heard by the Court on July 22, 2010.  (ECF # 140.)

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Syracuse University ("Syracuse") moves the Court in the alternative for an order (i)

transferring venue of this case to the United States Bankruptcy Court for the Northern District of

New York; (ii) lifting the automatic stay pursuant to section 362(b) of the Bankruptcy Code to

allow pending litigation in state court (the "State Court Actions") to go forward; or (iii)

dismissing this case pursuant to section 1112(b) of the Bankruptcy Code ("Motion").  (ECF #

51.)  Niagara Mohawk Power Corporation ("Niagara Power") joins Syracuse's request to change

venue to the Northern District of New York.  (ECF # 63.)  Project Orange Associates, LLC

("Project Orange" or "Debtor") opposes the motion.  The Court held a hearing on the motion on

June 7, 2010.  On June 9, 2010, in a written Order, the Court denied the portion of Syracuse's

motion seeking to transfer venue.  (ECF # 97.)  The Court now addresses the remainder of the

requested relief, granting Syracuse's motion to lift the automatic stay to proceed in the State

Court Actions, and denying its request to dismiss the case.

## I.    BACKGROUND

The Debtor operates a cogeneration facility in Syracuse, New York (the "Facility"),

which produces both electricity and steam.  Operating since 1992, the Facility provided electrical

services to the Syracuse, New York area as well as steam to Syracuse itself.  The Facility also

provides electrical services to the New York Independent System Operator ("NYISO"), a non-

profit organization that monitors New York's wholesale electricity market.  (Affidavit of Adam

Victor Pursuant to Rule 1007-2 of the Local Bankruptcy Rules at ¶ 7 (ECF # 4) (hereinafter

"Victor Local Rule 1007-2 Aff.").)

The Debtor's relationship with Syracuse began over two decades ago.  Syracuse and

various entities associated with Project Orange's principal, Adam Victor, began negotiating in

1982 for an arrangement whereby these entities would provide Syracuse with steam, and entered into two contracts, in 1984 and 1987, respectively, which were never implemented due to regulatory and financing issues.  *Syracuse Univ. v. Project Orange Assoc., LLC*, Index No. 2008-8203, slip op. at 3-5 (N.Y. Sup. Onondaga Cty., March 23, 2010) (Affidavit of Jonathan B. Fellows, May 12, 2010 (hereinafter "Fellows Aff."), Ex. J.  (hereinafter "Summary Judgment Opinion").)  On February 27, 1990, Syracuse and Project Orange entered into three contracts (the "Agreements"):  (1) Project Orange leased land from Syracuse adjacent to pre-existing Syracuse steam plants (the "Lease"), where it constructed the Facility at a price of $200 million; (2) Syracuse outsourced operation of its existing steam plants to Project Orange (the "Operating Agreement"); and (3) Project Orange agreed to terms governing the sale of steam to Syracuse (the "Steam Contract").  (Fellows Aff. at ¶ 7; Victor Rule 1007-2 Aff. at ¶ 14.)  At approximately the same time the parties entered into these three Agreements, Project Orange entered into a 40 year contract with Niagara Power.  Under the contract, Niagara Power paid Project Orange six cents per kilowatt hour of electricity, a favorable rate.  (Fellows Aff. at ¶¶ 8–9; Victor Rule 1007-2 Aff. at ¶ 16.)  Syracuse maintains that Project Orange was required to provide it steam pursuant to the New York Public Service Law to qualify for this advantageous rate.  (Fellows Aff. at ¶ 9 (citing N.Y. PUB. SERV. LAW § 66-c (McKinney 1990)).)  The Debtor argues that the minimum six cent sales price enabled it to sell steam to Syracuse below market rates.  (Victor Rule 1007-2 Aff. at ¶ 16.)

Six years after completing the Facility, financial troubles struck Niagara Power.  To avert bankruptcy, the NYISO required Niagara Power to restructure all of its existing electric contracts, including its contract with Project Orange.  (Victor Rule 1007-2 Aff. at ¶ 17.)  In consideration for restructuring its contract with Niagara Power, Project Orange received a single

3

payment of $153 million and a power put agreement (the "Power Put Agreement") as well as an

index swap agreement (the "Index Swap Agreement").  Project Orange later sold the Index Swap

Agreement in exchange for a $73 million note, payable in 95 installments.  (Victor Rule 1007-2

Aff. at ¶ 17 n.1; Fellows Aff. at ¶ 4.)  Project Orange maintains that the Power Put Agreement

fundamentally altered the nature of its business, requiring it to compete in the free market.  Due

to these pressures Project Orange saw a drastic drop in demand for its electricity.  (Victor Rule

1007-2 Aff. at ¶ 17.)  Syracuse, however, argues that Project Orange's principal, Mr. Victor,

used the payouts Project Orange received from the renegotiation of its contract with Niagara

Power to personally enrich himself.  (Fellows Aff. at ¶ 4.)  Mr. Victor contends that the payouts

were used to pay off the loans used to construct the Facility and may have been used to pay

certain tax obligations of partners involved in acquiring the Facility.  Deposition of Adam Victor,

December 18, 2009, 200:3-17.  (Fellows Aff. Ex. B.)

### A.  Project Orange's Litigation with Syracuse

Syracuse argues that as a result of these transactions Project Orange cannot possibly meet

its obligations under the Agreements and has commenced numerous litigations to avoid this

unpleasant reality.  (*See* Fellows Aff. ¶ 10.)  The Debtor has asserted fraud claims in state court

contesting the validity of the Steam Contract, contending that the price of steam was fraudulently

obtained and Syracuse has been unjustly enriched by reselling the steam to others.  Syracuse, in

turn, has commenced two actions (1) seeking declaratory relief regarding the Steam Contract and

(2) to evict the Debtor from the Facility under the Lease.  Syracuse argues that the Lease has

been terminated as a result of the Debtor's repudiation of the Steam Contract and its failure to

make certain tax and utility payments due under the Lease.  The Debtor also has attempted to toll

its cure period with respect to any defaults under the Lease in a so-called *Yellowstone* action.

The Debtor has further attempted to have the Facility condemned, and has filed a complaint

before the New York State Public Service Commission ("PSC"), alleging that Syracuse's sale of

steam to certain Ancillary Customers, as defined in the Operating Agreement, is not lawful

without a certificate from PSC authorizing the sale.

        1.     *The Steam Contract Litigation*

        a.    <u>Negotiation</u>

Following Project Orange's restructuring of its contracts with Niagara Power in 1998,

Syracuse grew concerned that Project Orange would not be able to continue providing steam

under terms of the Steam Contract after payouts from the sale of the Index Swap Agreement

were completed.  (Fellows Aff. at ¶ 10.)  Syracuse and Project Orange entered talks to restructure

the Steam Contract.  Syracuse maintains that during these negotiations Project Orange demanded

that Syracuse increase the amount it paid for steam to make up for lost revenue as a result of

Project Orange's restructuring of its contract with Niagara Power.  (*Id.*)  The Debtor, for its part,

admits that the advantageous Niagara Power contract allowed it to be profitable despite the

allegedly below-market rate Syracuse paid for steam under the Steam Contract.  (Victor Rule

1007-2 Aff. at ¶ 19.)  The Debtor argues, however, that it continued to provide steam pursuant to

the terms of the Steam Contract for eleven years while searching for ways to reduce its steam

production costs.  (*Id.* at ¶ 26.)  Following technical issues with turbines at the Facility, the

Debtor claims it sought to renegotiate the steam price at a rate that would still be significantly

below the market price.  (*Id.*)

The negotiations lasted three years.  (*See id.* at ¶ 27.)  During the talks, Syracuse

maintains, Project Orange began to question whether the Steam Contract was binding.  (Fellows

Aff. at ¶ 11.)  Specifically, Project Orange claimed that the price in the Steam Contract was

fraudulently obtained, based in large part on comparison to the price formulas contemplated by the two 1984 and 1987 contracts into which Mr. Victor's other entities had entered with Syracuse that never became effective due to regulatory and financing issues, and that it could avoid the Agreements by having the state condemn the Facility.  Project Orange purportedly threatened suit on these grounds if Syracuse did not agree to a new steam price.  (*Id.*)  The negotiations were unsuccessful.  (Victor Rule 1007-2 Aff. at ¶ 27.)

### b.   The New York County Action

In September 2008, Project Orange sued Syracuse in New York State Supreme Court for New York County in *Project Orange Assocs., L.P. v. Syracuse Univ.*, No. 602794/2008.  (*See* Fellows Aff. at ¶ 12) (the "New York County Action").  The complaint averred that the price in the Steam Contract was fraudulently obtained and that Syracuse was unjustly enriched by reselling the steam to others.  (*Id.*)  Soon after filing, Project Orange sought a temporary restraining order and a preliminary injunction requiring Syracuse to pay a higher price for steam. (*Id.* at ¶ 14.)

### c.   The Syracuse Action

In response, on or about October 15, 2008, Syracuse filed an action seeking declaratory relief regarding the Steam Contract in New York State Supreme Court for Onondaga County in *Syracuse Univ. v. Project Orange Assocs., LLC*, No. 2008-8203 (the "Syracuse Action").  (*Id.* at ¶ 13; Summary Judgment Opinion at 2.)  Syracuse moved to dismiss the New York County Action or have it transferred to Onondaga County.  (*Id.* at ¶ 13.)  In the Syracuse Action, Syracuse sought a declaratory judgment that (a) the Steam Contract was valid, enforceable and binding upon the Debtor; (b) the Debtor had to continue supplying steam to Syracuse at the price in the Steam Contract; and (c) Syracuse should be permitted to terminate the Agreements

6

because the Debtor did not provide adequate assurances that the Debtor would be able to

continue its obligations after June 2008, when its payments from the sale of the Index Swap

Agreement were scheduled to end.  (Motion at ¶ 22.)  Justice Fried granted Syracuse's motion to

transfer venue in the New York County Action on December 12, 2008.  *Project Orange Assocs.,*

*L.P. v. Syracuse Univ.*, No. 602794/2008, slip. op. at 3.  (*See* Fellows Aff. Ex. H.)  The Appellate

Division, First Department denied the Debtor's request for a stay of the order transferring venue.

(Fellows Aff. at ¶ 13.)  In January 2009, shortly after abandoning its appeal in the First

Department, the Debtor asserted counterclaims in the Syracuse Action almost identical to its

claims in the New York County Action, alleging that the price in the Steam Contract was

fraudulently obtained and that Syracuse was unjustly enriched by reselling the steam to others.

(*Id.* at ¶ 15.)  The Debtor sought damages in excess of $50 million.  (Motion at ¶ 24.)  Project

Orange also sought a preliminary injunction in the Syracuse Action enjoining Syracuse from (i)

requiring that Project Orange produce steam at a price lower than its cost; (ii) interfering with the

installation of a boiler at the Facility; and (iii) requiring Project Orange to produce steam

Syracuse intends on reselling for profit.  Transcript of Record 17–18, *Syracuse Univ. v. Project*

*Orange Assocs., LLC.*, Index No. 2008-8203 (May 15, 2009) (Fellows Aff. Ex. I) (hereinafter,

"May 15 Tr.").  Justice DeJoseph denied the preliminary injunction on May 15, 2009, finding

himself "hard-pressed to conclude at this juncture that [the Debtor] has a likelihood of success on

the merits on its cause of action for reformation, or for that matter on any of its other causes of

action."  *Id.* at 22–23, 26.

Following denial of the Debtor's motion for a preliminary injunction the parties

conducted discovery, including the production of "thousands of documents" as well as multiple

depositions in December 2009.  (Fellows Aff. at ¶ 16.)  Syracuse then moved for summary

judgment in the Syracuse Action to dismiss Project Orange's counterclaims.  (*Id.* at ¶ 17.)

Argument on the motion was heard on March 23, 2010.  (*Id.*)  Following argument Justice

DeJoseph announced he would issue an opinion granting Syracuse's motion in its entirety,

dismissing all of Project Orange's claims.  (*Id.*)  Justice DeJoseph issued the Summary Judgment

Opinion on April 16, 2010.  The Summary Judgment Opinion rejected each of Project Orange's

claims and concluded, with regards to the allegation that the Steam Contract price was obtained

through fraud, that

> other than the allegations of [Project Orange's] pleading and the
> conclusory testimony and/or affidavits of its principal, Adam Victor, there
> is not a scintilla of evidence to support its claim of fraud on the part of
> [Syracuse] at any time during the negotiation and signing of the [Steam
> Contract]—a contract which was signed some eighteen years before
> commencement of this lawsuit.

(Summary Judgment Opinion at 10–11.)  Syracuse submitted an order to Justice DeJoseph for

entry in accordance with his opinion.  (Fellows Aff. at ¶ 18.)  Justice DeJoseph was prepared to

sign the order but is now holding the order in light of the Debtor's bankruptcy filing.  Letter from

Justice DeJoseph to Jonathan B. Fellows, Esq., Thomas P. Puccio, Esq. and W. Bradley Hunt,

Esq. (May 3, 2010).  (Fellows Aff. Ex. K; *id.* at ¶ 18.)  The Debtor, for its part, is essentially

silent with regards to these proceedings, meekly stating in its Local Rule 1007-2 affidavit that it

"no longer provides [Syracuse] with steam and there has been no final judgment with respect to

the breach of [the Steam Contract] action."  (Victor Local Rule 1007-2 Aff. at ¶ 27.)

       2.   *The Lease Litigation*

     Syracuse maintains that the Debtor defaulted on the Lease by (i) failing to timely pay

property taxes as required by the Lease's terms; and (ii) repudiating the Steam Contract.

(Fellows Aff. at ¶ 19.)  As a result, the Debtor commenced a so-called *Yellowstone* action before

Justice DeJoseph, and Syracuse commenced a proceeding to evict the Debtor from the Facility.

8

a.   Default Allegations Based on Failure to Pay Taxes

Rent under the Lease is one dollar a year.[2]  With regards to the Debtor's failure to pay

property taxes, Syracuse maintains that the terms of the Lease required Project Orange to pay all

taxes on the Facility as "additional rent."  While the Lease gave Project Orange the right to

contest the proper amounts of taxes, it still required them to be paid when "due."  Failure to

make these payments, Syracuse argues, constitutes a default under the Lease.  (*Id.* at ¶ 20.)

Unsurprisingly, the Debtor contests Syracuse's position.  At the same time Project

Orange entered into the Agreements with Syracuse it contracted with the Syracuse Industrial

Development Authority to make payments in lieu of taxes ("PILOT").  (*Id.* at ¶ 23.)  The Debtor

maintains that its obligation to make PILOT payments ceased in 2000 or, at least, that the

amounts due should have been substantially reduced.  (Affidavit of Adam Victor in Opposition

to the Motion (hereinafter the "Victor Opp. Aff.") at ¶ 23.)  Despite this contention, it appears

that Project Orange continued making PILOT payments until July 31, 2008.  Letter from Sheldon

A. Ashkin, Syracuse Department of Finance to Project Orange Associates (Aug. 11, 2008).

(Fellows Aff. Ex. M.)  Because Project Orange halted its PILOT payments, Syracuse maintains

that the City of Syracuse (the "City") ended the PILOT agreement and put the Facility back on

the tax rolls.  (*Id.* at ¶ 25.)  The City soon started issuing tax bills to Project Orange for the

Facility.  Tax Bill for the Period July 1, 2009 to June 30, 2010.  (*Id.* Ex. O.)  Project Orange did

not pay and Syracuse claims that it was forced to make a payment of $125,534.75 on July 22,

2009 to avoid a tax lien encumbering the property.  (*Id.* at ¶ 27, Ex. P.)

On October 9, 2009, Syracuse wrote Project Orange, explaining that its failure to make

tax payments constituted a default on the Lease and reserving Syracuse's right to terminate the

---

[2]        Syracuse states that rent is so low because the real consideration for granting the leasehold was the
Debtor's obligation to provide steam under the terms of the Steam Contract.  (Fellows Aff. at ¶ 20.)

Agreements in light of this default.  Letter from Thomas R. Smith to Thomas Puccio (Oct. 9,

2009).  (Fellows Aff. Ex. Q.)  Project Orange responded on October 27, 2009, with a letter from

its counsel, Thomas Puccio.  Puccio explained that Project Orange ceased making PILOT

payments because an attorney from the City stated that its obligations ended when certain bonds

were retired in 1999.  Puccio also explained that because the Facility had decreased in value it

was "highly unlikely that the real estate taxes levied by the City of Syracuse . . . are based on an

accurate assessment of value."  Letter from Thomas Puccio to Thomas R. Smith (Oct. 27, 2009).

(Fellows Aff. Ex. R.)  Syracuse responded two days later, explaining that Project Orange could

challenge the tax assessment if it pleased, but this did not excuse its default under the Lease.

Letter from Thomas R. Smith to Thomas Puccio (Oct. 29, 2009).  (Fellows Aff. Ex. S.)

On December 15, 2009, Syracuse informed Project Orange via letter that it considered

the Lease terminated as of November 15, 2009.  Letter from Thomas R. Smith to Thomas Puccio

(Dec. 15, 2009) (Fellows Aff. Ex. T) (hereinafter, "December 15 Letter").  The December 15

Letter also stated that Syracuse had informed Project Orange that it had defaulted on the Lease in

a prior letter, dated October 9, 2009.  (*Id.*)  Because 60 days had passed since the earlier letter

and the defaults had not been cured, Syracuse asserted that the Lease had terminated under

Section 27.01(a) and (b) of the Lease.  (*Id.*)  Since this putative termination, Syracuse has

continued to make tax payments on the Facility.  The Facility has also incurred, but has not paid,

water bills Syracuse will likely be forced to pay to avoid the threat of additional liens on the

Facility.  (*Id*. at ¶¶ 32–35.)

In response to these numerous factual allegations, the Debtor claims only that it "has

defenses" to the taxes Syracuse alleges to have paid on its behalf.  (Victor Opp. Aff. at ¶ 24.)

The Debtor alleges that it has "significant factual disputes" with Syracuse regarding the tax

payments and claims that Syracuse only made the payments to "create an artificial default under

the Lease." (*Id.*)  Specifically, the Debtor claims that it believes that (i) the Facility is being

taxed at an inappropriate rate; (ii) it was negotiating with the City regarding the proper amount of

taxes when Syracuse made some of these payments; and (iii) it no longer receives tax bills from

the City.  (*Id.*)  The Debtor maintains, however, that it will make all tax payments going forward,

provided it has proper notice of the amounts due.  (*Id.*)

       b.  <u>Default Allegations Based on Repudiation</u>

Syracuse also maintains that Project Orange repudiated the Steam Contract on October

15, 2009, which also constituted a default under the Lease.  (*See* Fellows Aff. at ¶ 38.)  As a

result, Syracuse contends that it is entitled to $150,000 per month in rent on account of the

Debtor's status as a holdover tenant since the Lease allegedly terminated in October 2009.

(Motion at ¶ 73 n.2.)

Project Orange wrote to Syracuse stating that it was "temporarily" ending steam

production on October 19, 2009 at 12:01 a.m.  Letter from Thomas Puccio to Jonathan B.

Fellows (Oct. 15, 2009).  (Fellows Aff. Ex. X.)  The letter explained that Project Orange was

forced to end production of steam because of (i) the artificially low and allegedly fraudulently

obtained amount Syracuse paid for steam under the Steam Contract; (ii) maintenance issues with

turbines at the Facility; and (iii) Syracuse's refusal to allow Project Orange to install a boiler at

the Facility.  (*Id.*)  The letter further stated that Project Orange was handing over operation of

Syracuse's existing steam plants and that Project Orange was willing to negotiate a new steam

price.  (*Id.*)  Syracuse responded on October 20, 2009, informing Project Orange that its decision

to not perform its duties was an anticipatory breach and repudiation of the Steam Contract.

Letter from Thomas R. Smith to Thomas Puccio (Oct. 20, 2009).  (Fellows Aff. Ex. Y.)

Syracuse's letter informed Project Orange that its repudiation constituted a default under the

Lease and gave notice to Project Orange that it intended to terminate the Lease on October 31,

2009 as a result of this default.  (*Id.*)  Syracuse later sent an additional notice of termination on

October 31, 2009, terminating the Lease as of November 15, 2009.  (Fellows Aff. at ¶ 41.)

      The Debtor claims that it never intended to repudiate the Steam Contract and only wished

to temporarily stop performing its contractual obligations.  (Victor Opp. Aff. at ¶ 20.)  It claims

the temporary cessation was due to *force majeures*, which were specifically contemplated in

Section 3.01 of the Steam Contract, and thus, under Section 3.03, it has thirteen months (until

October 19, 2010) to cure any default.  (Debtor's Obj. to Motion at ¶¶ 32-33.)  The *force*

*majeures* were purportedly that (1) "the artificially low and fraudulently obtained steam price

[Syracuse] pays [Project Orange] for steam"; (2) General Electric International, Inc. ("GEII")'s

"failure to meet its contractual obligation to maintain and operate" two turbines at the Facility;

and (3) Syracuse's refusal to permit Project Orange to install a package boiler at the Facility to

supplement steam production capabilities.  (*See id.* at ¶ 32; Letter from Thomas P. Puccio to

Jonathan B. Fellows (Oct. 15, 2009) (Fellows Aff. Ex. X); Letter from Jonathan B. Fellows to

Thomas P. Puccio (Oct. 29, 2009) (Fellows Aff. Ex. S).)  Syracuse vigorously contests that these

reasons are *force majeures* as defined in the Steam Contract, and, with respect to the package

boiler, it indicated in January 2009 that its consent was not required for the installation of the

package boiler.  *See* Letter from Jonathan B. Fellows to Thomas P. Puccio (Oct. 29, 2009).

(Fellows Aff. Ex. S.)  In denying the Debtor's motion for a preliminary injunction in the

Syracuse Action, Justice DeJoseph reasoned that Syracuse's "responsive letter of January 16,

2009, initially advised that Section 7.03 [of the Operating Agreement, dealing with required

consents] did not apply, and that if it did, the letter asked for no more information than required

by the contract" which did not constitute "action that would justify granting injunctive relief."

(May 15 Tr. at 24.)  Project Orange also argued in its counterclaims in the Syracuse Action that

Syracuse was not permitted to sell steam to certain Ancillary Customers (as defined in the

Agreements) under the Agreements, a contention which was squarely rejected by Justice

DeJoseph in the Summary Judgment Decision.  Summary Judgment Decision at 7.

    The Debtor maintains, however, that it has since stated that it is willing to abide by the

terms of the Steam Contract.  This, the Debtor argues, is sufficient to make any repudiation

ineffective.  (Victor Opp. Aff. at ¶ 22.)  Specifically, the Debtor states that it has made numerous

offers to Syracuse to deliver steam at the Steam Contract price—and has even made an offer to

provide steam free of charge—whenever Project Orange is producing electricity, so long as

Syracuse provides the water for steam production.  (*Id.* at ¶ 26.)

## c.  The Yellowstone Action

    Following its receipt of the various default letters in October 2009 based on its failure to

pay taxes and its alleged repudiation of the Steam Contract, the Debtor commenced a so-called

*Yellowstone* action on October 30, 2009 before Justice DeJoseph, *Project Orange Assocs., LLC

v. Syracuse Univ.*, Index No. 2009-7310. (the "Yellowstone Action").[3]  (Fellows Aff. at ¶ 42;

Victor Local Rule 1007-2 Aff. Ex. E.)  The Debtor failed in its efforts to receive expedited relief

in the Yellowstone Action, but obtained a temporary restraining order enjoining Syracuse from

---

[3]    A Yellowstone action, though not defined by Syracuse in its moving papers, refers to an action based on
the New York Court of Appeal's decision in *First Natl. Stores v. Yellowstone Shopping Ctr.,* 21 N.Y.2d 630 (N.Y.
Ct. App. 1968). "The purpose of a *Yellowstone* injunction is to allow a tenant confronted by a threat of termination
of the lease to obtain a stay tolling the running of the cure period so that after a determination of the merits, the
tenant may cure the defect and avoid a forfeiture of the leasehold." *Long Island Gynecological Servs., P.C. v. 1103
Stewart Ave. Assocs. Ltd. P'ship*, 224 A.D.2d 591, 593 (2d Dep't 1996) (internal citations omitted). "A tenant
seeking *Yellowstone* relief must demonstrate that (1) it holds a commercial lease; (2) it has received from the
landlord a notice of default, a notice to cure, or a threat of termination of the lease; (3) the application for a
temporary restraining order was made prior to the termination of the lease; and (4) it has the desire and ability to
cure the alleged default by any means short of vacating the premises." *Id.*

commencing or prosecuting any summary eviction proceeding based on the December 15, 2009

Letter.  (Fellows Aff. at ¶ 42; Debtor's Sur-Reply to Reply of Syracuse In Support of Motion

(hereinafter, "Debtor's Sur-Reply"), Ex. A.)  The Debtor and Syracuse agree that Project

Orange's non-payment of taxes was at issue in the Yellowstone Action, though they disagree that

it was specifically before Justice DeJoseph in the New York State Court Action.  (*See* Tr. June 7,

2010 Hearing 48:14-20 (ECF # 107).) ("So not only is it before [Justice] DeJoseph, it's before

[Justice] DeJoseph because they petitioned the Court to rule on it.")

> d.  <u>The Eviction Proceeding</u>

Syracuse in turn brought a summary eviction proceeding against Project Orange on or

about November 24, 2009, returnable on December 8, 2009, *Syracuse Univ. v. Project Orange*

*Assocs., LLC*, Supreme Court of New York, Index No. 2009-7882, due to the Debtor's alleged

defaults under the Lease ("Eviction Proceeding").  (*See* Fellows Aff. at ¶ 43; Victor Local Rule

1007-2 Aff. Ex. E .)

Approximately two weeks after the Debtor commenced the Yellowstone Action, and one

and a half weeks before Syracuse commenced the Eviction Proceeding, counsel for Syracuse

indicated that "no action to effect an eviction of Project Orange with respect to the Cogeneration

Facility will be taken without a prior order of the court obtained on notice.  Consequently, there

is no reason for Project Orange to make a Yellowstone Injunction, and counsel for Project

Orange agreed to refrain from seeking one."  Letter from Jonathan B. Fellows to Thomas P.

Puccio (Nov. 13, 2009).  (Debtor's Sur-Reply, Ex. B.)  Syracuse filed a summary judgment

motion to dismiss the Yellowstone Action on December 17, 2009.  Both the summary judgment

motion in the Yellowstone Action and the Eviction Proceeding were scheduled to be heard by

Justice DeJoseph on April 30, 2010—one day after the Debtor filed for Chapter 11 protection in this Court. (*See* Fellows Aff. at ¶¶ 42–44.)

          *3.  Regulatory Proceedings*

          In April and October 2009, while the Syracuse Action and the New York County Action were pending, but prior to the commencement of the Yellowstone Action and the Eviction Proceeding, the Debtor and one of its affiliates commenced two regulatory proceedings involving the Agreements, seeking to condemn the Facility and prevent Syracuse from selling steam to other customers.

          a.  <u>The Condemnation Proceeding</u>

          In April 2009, Project Orange Associates Services Corporation ("POASC"), an affiliate of the Debtor formed in 2008 under New York Transportation Corporations Law, commenced condemnation proceedings, pursuant to New York State Eminent Domain Procedure Law, in an apparent attempt to separate itself from Syracuse ("Condemnation Proceeding"). POASC sought to condemn the Steam Plant, "portions of the steam distribution system, and the land leased from [Syracuse] for the Facility." (Fellows Aff. at ¶ 45.) POASC held a public hearing and issued findings approving the condemnation. (*Id.*) On March 19, 2010, the New York Appellate Division, Fourth Department, determined that "the proposed condemnation is the last in a series of attempts to free [Debtor] from an unfavorable contractual agreement with [Syracuse]" and annulled the POASC findings. *Syracuse Univ. v. Project Orange Assocs. Servs. Corp.*, No. 09-01732, slip op. at 3 (4th Dep't 2010) (Fellows Aff. Ex. AA.) ("Fourth Department Condemnation Ruling"). POASC "recently" filed a notice of appeal of the Fourth Department Condemnation Ruling. (Victor Local Rule 1007-2 Aff. at ¶ 28.)

b.   The PSC Complaint

Though it had asserted almost identical counterclaims in the Syracuse Action (which were rejected by Justice DeJoseph in the Summary Judgment Opinion), on October 22, 2009, Project Orange filed a complaint against Syracuse with the New York Public Service Commission ("PSC"), contending that the sale of steam to other customers was not lawful absent a certificate from PSC authorizing the sale ("PSC Complaint").  (Fellows Aff. at ¶ 47.)  Syracuse contests these allegations, arguing that Syracuse's charter and a 1960 Third Department decision, *Syracuse Univ. v. Murphy*, 10 A.D.2d 468 (3d Dep't 1960), explicitly permit Syracuse to sell steam free of PSC regulation, and such sales were contemplated by the Agreements.  (*Id.*)  PSC has not acted on the PSC Complaint.

4. *The Current Motion*

Syracuse now seeks to lift the automatic stay to allow the state court to determine matters that were scheduled to be heard on April 30, 2010 before Justice DeJoseph, including Syracuse's motion for summary judgment dismissing the Yellowstone Action, and the Eviction Proceeding, which were originally returnable on January 12, 2010 and December 8, 2009, respectively, but adjourned repeatedly at Project Orange's request.  (Fellows Aff. at ¶ 17.)  Syracuse argues that permitting these actions to go forward in state court will result in a determination whether the Lease has been terminated, and whether, as a result, the Debtor can assume or assign the Lease under section 365 of the Bankruptcy Code.  (Motion at ¶ 54.)  Syracuse also seeks to lift the stay so that Justice DeJoseph may execute and enter an order in accordance with the Summary Judgment Opinion.  (*Id.* at ¶ 54 n.1.)  In the alternative, Syracuse seeks to dismiss the Debtor's case under 11 U.S.C. § 1112(b).  (Motion at ¶ 87-90.)

## II.    DISCUSSION

The Court concludes that cause exists to lift the automatic stay to permit the state court to decide the matters pending before it in the several state court actions commenced by Syracuse or Project Orange.  However, in the event that Syracuse prevails and the state court issues a warrant of eviction, the warrant may not be executed absent further order of this Court.

### A.    The Lease is Property of the Estate and, together with the other Agreements, Subject to the Automatic Stay Imposed by Section 362 of the Bankruptcy Code

Section 362(a) of the Bankruptcy Code imposes an automatic stay on all litigation against the Debtor, as well as "any act to create, perfect, or enforce any lien against property of the estate."  11 U.S.C. § 362(a).  "[T]he stay is particularly important in maintaining the status quo and permitting the debtor in possession . . . to attempt to formulate a plan of reorganization," as without it, "the debtor's assets might well be dismembered, and its business destroyed, before the debtor has an opportunity to put forward a plan for future operations."  3 COLLIER ON BANKRUPTCY ¶ 362.03[2] (15th ed. rev. 2010).

Section 541 of the Bankruptcy Code defines "property of the estate" to include, with exceptions not relevant here, "all legal or equitable interests of the debtor in property as of the commencement of the case."  It is well-settled that this Court must look to state law to determine whether an asset is "property of the estate."  *See Butner v. U.S.,* 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.")

Under bankruptcy law, however, a possessory interest in a lease, even without a legal interest, is "property of the estate" and thus subject to the automatic stay.  *E.g.*, *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse)*, 835 F.2d 427, 430 (2d Cir. 1987) ("Indeed, a mere possessory interest in real property, without any accompanying legal interest, is sufficient to trigger the protection of the automatic stay.").  In *48th Street Steakhouse,*

17

*Inc.*, the court recognized that absent an executed warrant of eviction, where a debtor-lessee remains in possession of the property that is the subject of the lease, the debtor has a possessory interest in the property that is protected by the automatic stay. *Id.* at 430. Here, the Debtor remains in possession of the Facility and no warrant of eviction has issued. The Summary Judgment Opinion (which has not yet been ordered) and the May 15, 2009 denial of Debtor's request for a preliminary injunction in the Syracuse Action, as well as the Fourth Department Condemnation Ruling, resolve some of the issues surrounding the Agreements in the State Court Actions, but do not fully address whether the Agreements have been terminated or repudiated such that they cannot be assumed and assigned by the Debtor.[4]

### B. The Automatic Stay Should be Lifted to Permit the State Court Actions to Proceed

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ."[5] 11 U.S.C. § 362(d)(1). While a debtor's possessory rights in a lease "trigger the

---

[4] "It is settled law that a lease or license that was terminated before the filing of a bankruptcy petition is neither affected by the automatic stay under 11 U.S.C. § 362(a) nor may it be assumed by the debtor under 11 U.S.C. § 365." *See In re Scarsdale Tires, Inc.*, 47 B.R. 478, 480 (Bankr. S.D.N.Y. 1985) (internal citations omitted); *see also In re Sweet N Sour 7 th Ave. Corp.*, No. 10-12723, 2010 WL 20710433, at *5 (Bankr. S.D.N.Y. June 18, 2010). Furthermore, Syracuse points to authority in which a debtor cannot assume a properly repudiated agreement as repudiation is equivalent to termination under 11 U.S.C. § 365. *See In re Oklahoma Trash Control, Inc.*, 258 B.R. 461, 464 (Bankr. N.D. Okla. 2001). In New York it may very well be that where one party repudiates a contract, the other party may treat the contract as terminated, *Computer Possibilities Unlimited v. Mobile Oil Corp.*. 747 N.Y.S.2d 468, 477 (1st Dep't 2002), and thus the contract is not capable of being assumed. The issue whether any of the Agreements was repudiated and, therefore, terminated, is more appropriately decided by the state court. The Debtor's arguments that repudiation is a question of fact to be decided after discovery, *O'Connor v. Sleasman*, 14 A.D. 3d 986, 988 (3d Dep't 2005), *leave to appeal denied*, 9 N.Y. 3d 806 (2007), does not change this Court's conclusion that, considering all of the discovery and other proceedings that have already taken place in the Syracuse Action, the state court is the most efficient and appropriate forum for any future proceedings.

[5] Syracuse does not indicate under which subsection of 362(d) it is moving to lift the stay. However, "[a]t a minimum, a motion to continue a pre-petition litigation implicates section 362(d)(1)," and courts finding cause to lift the stay under section 362(d)(1) need not engage in a section 362(d)(2) analysis. *See In re Touloumis*, 170 B.R. 828, 830 (Bankr. S.D.N.Y. 1994) (citing *Sonnax Indus., Inc. v. Tri-Component Prods. Corp. (In re Sonnax Indus., Inc.)*,

applicability of the automatic stay in the first instance, they are not determinative of the fundamentally different question as to whether the stay, once triggered, should be modified or terminated for cause." *In re Eclair Bakery, Ltd.*, 255 B.R. 121, 134 (Bankr. S.D.N.Y. 2000).

A party moving to lift the stay under section 362(d)(1) "must initially produce evidence establishing 'cause' for the relief he requests." *In re Touloumis*, 170 B.R. at 828. Once the moving party establishes a *prima facie* case for "cause," the burden shifts to the debtor to disprove its existence. *Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*, 183 B.R. 682, 687 (S.D.N.Y. 1994) (citing 11 U.S.C. § 362(g)(1)) ("*Burger Boys")*; *In re Touloumis*, 170 B.R. at 828. "If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax*, 907 F.2d at 1285.

"Neither Section 362(d)(1) nor the legislative history defines 'cause.'" *In re Touloumis*, 170 B.R. at 828. "'Cause' is an intentionally broad and flexible concept which must be determined on a case-by-case basis." *In re Brown*, 311 B.R. 409, 412–13 (E.D. Pa. 2004) (internal citation omitted). Whether to lift the stay is in the bankruptcy court's discretion. *Burger Boys*, 183 B.R. at 687–88. Still, the legislative history of 362 reveals that Congress intended "that one of the factors to consider when determining whether to modify the stay is whether doing so would permit pending litigation involving the debtor to continue in a nonbankruptcy forum," as "[i]t will often be more appropriate to permit proceedings to continue in their place of origin, where no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere." H.R. Rep. No. 95-595, at 341 (1977), U.S. Code Cong. & Admin.

_____

907 F.2d 1280, 1285 (2d Cir. 1990) ("*Sonnax"*)); *In re 3220 Erie Blvd. East, Inc.*, 121 B.R. 684, 687 n.4 (Bankr. N.D.N.Y. 1990) ("*Erie Blvd.*").

News 1978, at 5963, 6297; S. Rep. No. 95-989, at 50 (1978), U.S. Code. Cong. & Admin. News

1978, at 5787, 5836.

   In determining whether the stay should be modified or terminated for cause, courts in this

Circuit and elsewhere either (1) analyze twelve factors enumerated by the Second Circuit in

*Sonnax*; or (2) engage in fact-intensive inquiries which appear to be loosely based on the *Sonnax*

factors, mainly attempting to maintain the prepetition *status quo ante* between the parties.  *E.g.*,

*Burger Boys*, 183 B.R. at 688; *In re Bison Res., Inc.,* 230 B.R. 611, 613 (Bankr. N.D. Okla.

1999); *In re Odd's-N'End's, Inc.*, 171 B.R. 10, 11 (Bankr. W.D.N.Y. 1994).  Some courts utilize

a hybrid approach, combining these two analyses.  *See, e.g.*, *In re Brown*, 311 B.R. at 412–13

(stating that "[a] court may consider the policies reflected in the bankruptcy code, and the

interests of the debtor, other creditors and any other interested parties" in applying the *Sonnax*

factors) (internal citations omitted).

   Alternatively, "cause" to lift the stay can exist if a debtor's actions in the case are in bad-

faith, utilizing the same standard of bad faith applied to determine whether a case should be

dismissed under 11 U.S.C. § 1112(b).  *In re Eclair Bakery Ltd.*, 255 B.R. at 138 (citing *In re*

*234-6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr. S.D.N.Y.1997)).

   The Court addresses each approach in turn.  As explained further below, the Court finds

that lifting the stay to permit the State Court Actions to proceed is appropriate here under the

first and second analyses; however, the Court does not find that the Debtor's actions constitute

bad faith sufficient to lift the stay or dismiss the case under section 1112(b).

   *1.  The Sonnax Analysis*

   In determining whether "cause" exists to lift the automatic stay under section 362(d) to

permit litigation to proceed in another forum, some courts in the Second Circuit look to twelve

factors. *E.g.*, *Sonnax*, 907 F.2d at 1286. These factors are:

> (1) whether relief would result in a partial or complete resolution of the
> issues; (2) lack of any connection with or interference with the bankruptcy
> case; (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's insurer has
> assumed full responsibility for defending it; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum
> would prejudice the interests of other creditors; (8) whether the judgment
> claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a
> judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether
> the parties are ready for trial in the other proceeding; and (12) impact of
> the stay on the parties and the balance of harms.

*Id.* (citing *In re Curtis,* 40 B.R. 795, 799–800 (Bankr. D. Utah 1984)). A court need only apply

the factors that are relevant to the particular case, and does not need to give each factor equal

weight. *Burger Boys*, 183 B.R. at 688.

Here, the Court must determine whether to lift the automatic stay to permit state court

litigation to proceed and the order implementing the Summary Judgment Opinion to be entered,

which will likely (1) determine both parties' rights and obligations under the Steam Contract,

including whether Syracuse fraudulently obtained the price of steam provided therein, was

prohibited from selling steam to others, was unreasonably interfering with the Debtor's attempts

to install the boiler, and could terminate the Steam Contract due to the Debtor's alleged failure to

provide adequate assurance that it could continue its obligations thereunder (Syracuse Action);

(2) determine whether the Debtor repudiated the Steam Contract (Eviction Proceeding and

Yellowstone Action); and (3) determine whether the Lease has terminated due to the Debtor's

alleged defaults in failing to pay taxes and repudiation of the Steam Contract (Eviction

Proceeding and Yellowstone Action).

21

Applying the *Sonnax* factors, courts in this Circuit have lifted the automatic stay to permit state court litigation to proceed that would determine whether a lease has been terminated prepetition and is therefore incapable of being assumed or assigned under section 365 of the Bankruptcy Code.  For example, in *Burger Boys,* 183 B.R. at 684, the debtor's landlord commenced a prepetition non-payment summary proceeding to evict the debtor.  The debtor asserted six counterclaims alleging that the landlord breached the letter of the lease by abandoning the particular building in which the debtor operated its restaurant for a new building. *Id.*  The landlord in turn claimed that the debtor could not assert counterclaims under the terms of the lease.  *Id.*  On the "eve of trial," the debtor filed its chapter 11 petition, automatically staying the summary proceeding, and then filed an adversary proceeding in the bankruptcy court asserting the same six claims it had asserted as counterclaims in the summary proceeding.  *Id.* The landlord moved to lift the stay under section 362 of the Bankruptcy Code to permit the summary proceeding to proceed and requested that the bankruptcy court abstain from deciding the adversary proceeding under 28 U.S.C. § 1334(c)(2).  *Id.*

The bankruptcy court (a) abstained from adjudicating the adversary proceeding, which it determined was a "non-core" proceeding, on the condition that the landlord "withdraw its affirmative defense to the counterclaims in the Summary Proceeding and consent to the transfer of the counterclaims to the State Supreme Court where more extensive discovery is permitted," and (b) lifted the stay to permit the landlord to proceed against the debtor in state court in the event that the debtor failed to assume or reject the lease within a sixty day extension it gave the debtor to assume or reject any leases.  *Id.*  The district court affirmed.  *Id.*  It determined that the bankruptcy court considered five of the *Sonnax* factors in its decision to lift the stay, "albeit not by name":

(a) The Court ascertained whether relief would result in a partial or complete resolution of the issues by inquiring how the whole case, including [the debtor's] counterclaims, could be tried in Civil Court and made arrangements for full relief by conditioning its abstention Order on [the landlord's] consent to the transfer of [the debtor's] counterclaims to State Court; (b) In its determination that the Adversary Proceeding was a noncore proceeding from which it was required to abstain, the Court essentially decided that litigation of the issues in another forum would not interfere with the bankruptcy proceeding; (c) The Court addressed how best to serve the interests of judicial economy and the expeditious and economical resolution of the litigation; (d) The Court knew the parties were ready for trial in the other proceeding, because [the debtor] had filed its Chapter 11 petition 'on the eve of the Civil Court trial'; (e) The Court balanced the harms and impact of the stay on the parties by crafting an order that permitted [the debtor] an extension of sixty days to assume or reject the lease during which time the automatic stay would continue, provided [landlord] received use and occupancy fees.  And, the Court abstained under an arrangement that would allow both parties to litigate their claims fully.

*Id.* at 688 (internal citations omitted).  The debtor in *Burger Boys* asserted the same arguments the Debtor asserts here; namely, that the balance of the harms weighed in favor of continuing the automatic stay, because otherwise the debtor would have to "litigate in three different forums," a New York Civil Court, Supreme Court, and the bankruptcy court, which would be so costly that "the lease will be lost and the business will be forced into liquidation to the detriment of not only itself, but also all of its creditors." *Id.*  The district court noted that "the validity of this claim [was] an issue of fact," but "[c]ourts have held . . . that the increased costs of litigating in a particular forum are not so prejudicial as to require continuance of a stay," and "there is no evidence in the record regarding the validity of [debtor's] claim that it will be forced into liquidation if the stay were lifted."  *Id.* (citing *In re Keene Corp.*, 171 B.R. 180, 185 (Bankr. S.D.N.Y. 1994)).

Bankruptcy courts have also lifted the stay on the ground that state courts are the

23

appropriate forum to decide fraud claims arising out of leases, such as the fraud claims at issue

here in the Syracuse Action and the Yellowstone Action (the disposal of which arguably affects

whether the Lease was terminated).  For example, in *In re Bison Resources, Inc.,* 230 B.R. at

613, the shareholders of the debtor claimed to hold a leasehold interest with respect to oil and gas

rights, based upon their interests in an earlier lease ("1987 Lease").  The lessors brought a

prepetition state court action against the shareholders of the debtor and the debtor, among others,

"assert[ing] claims for negligence, fraud, deceit, spoliation of evidence, concealment, failure to

pay royalties, unauthorized extraction of minerals, surface damage, unauthorized removal of

timber and intentional trespass with regard to [a certain] well," primarily based on the allegation

that the 1987 Lease was of no force and effect and thus the current lease was of no force and

effect.  *Id.*  The state court action "progressed for over two and one-half years," with "[a]ll pre-

trial preparation" completed.  *Id.*  The state court granted partial summary judgment against the

shareholders of the debtor invalidating their alleged leasehold interest two days after the debtor

filed for bankruptcy.  *Id.*  Trial by jury of the remainder of the claims against the other

defendants, including the debtor, was scheduled to begin four days later, but was stayed by the

debtor's bankruptcy filing.  *Id.*  The lessors sought to lift the stay to proceed in state court against

the debtor.  The court applied factors almost identical to those used by the *Sonnax* court, in

addition to evaluating "the creditor's chances of success on the merits," to determine that lifting

the stay to permit the various state court actions to proceed was appropriate.[6]  *Id.* at 616–17.

---

[6]        The *Bison Resources, Inc.* court considered "(1) trial readiness; (2) judicial economy; (3) the resolution of
preliminary bankruptcy issues; (4) costs of defense or other potential burden to the estate; (5) the creditor's chances
of success on the merits; (6) specialized expertise of the non-bankruptcy forum; (7) whether the damages or claim
that may result from the nonbankruptcy proceeding may be subject to equitable subordination under Section 510(c);
(8) the extent to which trial of the case in the non-bankruptcy forum will interfere with the progress of the
bankruptcy case; (9) the anticipated impact on the movant, or other nondebtors, if the stay is lifted; and, (10) the
presence of third parties over which the bankruptcy court lacks jurisdiction." *In re Bison Resources, Inc.,* 230 B.R.
at  616-17 (citing *In re Marvin Johnson's Auto Serv., Inc.,* 192 B.R. 1008, 1014 (Bankr. N.D. Ala. 1996)).

With regard to concerns of litigation in multiple fora, the court concluded "[w]hile the cost of defense is a factor to be considered, that factor, standing alone, is ordinarily insufficient reason to deny relief from the automatic stay." *Id.* The court then "allow[ed] the State Court Action to proceed to judgment," but refused to permit the lessors to "take any steps to enforce said judgment *against [the debtor].*" *Id.* at 619 (emphasis in original).

Here, the Syracuse Action, the Yellowstone Action and the Eviction Proceeding similarly involve alleged fraud and issues of state landlord-tenant and contract law. The Court finds that applying the *Sonnax* factors weigh in favor of lifting the stay to permit the State Court Actions to proceed.

### i.    Factor One – Whether Relief Would Result in a Partial or Complete Resolution of the Issues

Permitting Justice DeJoseph to rule on the Eviction Proceeding, the Yellowstone Action, and the Syracuse Action will likely result in a complete resolution of the issues surrounding whether the Lease and the other Agreements can be assumed under section 365 of the Bankruptcy Code. The Debtor argues that stay relief will not completely resolve the issues; the Eviction Proceeding "cannot possibly go forward because there are too many disputed facts" and if Syracuse succeeds at the state court level, the Debtor would appeal, leading to additional litigation.[7] (Debtor's Obj. to Motion at ¶ 47.)

First, the courts in *Burger Boys* and *Bison* did not take into account the potential that the Debtor could successfully appeal any state court judgment in determining whether lifting the stay would completely resolve the issues. Given Project Orange's litigation history, the Court

---

[7]    The Debtor also argues that lifting the stay will not result in a complete resolution of the issues because "[t]he State Court Action of course will not determine the validity and extent of [Syracuse's] liens, or the amount of SU's claims." (Debtor's Obj. to Motion at ¶ 47.) By the current Motion, Syracuse does not explicitly seek lift-stay relief concerning "the validity and extent" of its liens or the amount of its claims; accordingly, the Court does not consider the liens and claims among the "issues" before it at the present time.

presumes that the Debtor will appeal in whatever court system it loses, if that occurs.  This Court

similarly rejects the argument that the mere possibility of an appeal should affect the analysis.

Furthermore, while discovery in the Eviction Proceeding may be necessary (an issue to be

decided by the state court), the Debtor and Syracuse have been embroiled in litigation on

multiple fronts for years in state court before Justice DeJoseph, and permitting discovery to

proceed further in state court will not change the status quo as of the petition date.  If Justice

DeJoseph determines that the Agreements were properly terminated, there will be nothing to

assume, and by the Debtor's own admissions, it will not be able to reorganize. (Victor Opp. Aff.

at ¶ 28.)  If Justice DeJoseph determines that the Agreements were not properly terminated, the

Debtor can seek to assume or reject the Agreements in this Court, subject to the Court's approval

of its business judgment and a determination of any cure amounts, pursuant to section 365 of the

Bankruptcy Code. [8]

> ii.    *Factors (a) Two – Lack of Any Connection With or Interference With the
> Bankruptcy Case; (b) Seven – Whether Litigation in Another Forum Would
> Prejudice the Interests of Other Creditors*

Lifting the automatic stay will greatly assist this Court with the bankruptcy case, not

interfere with it.  *See supra* n.4.  The termination of the Lease and repudiation of the Steam

Contract disputes as well as the Yellowstone Action raise questions of state contract, fraud and

landlord-tenant law, all best resolved by a state court.

The Debtor's arguments against lifting the stay turn on the interpretation of the

---

[8]        The Court does not determine at this time whether, should the Debtor prevail in state court, the Debtor
could assume or reject individual Agreements, as the Debtor argues, or whether it could only assume or reject the
Agreements as a group, as Syracuse contends.  (Debtor's Obj. at 2 n.2; Reply of Syracuse in Support of Motion at ¶
64.)  Similarly, the Debtor's citation to authority that assumption and assignment motions are "core" and thus the
stay should not be lifted is inapposite here.  In the authority cited by the Debtor, the district court determined that a
declaratory action regarding the enforceability of a PILOT agreement was "core" because it was connected with the
debtor's motion to assume and assign a certain lease, a breach of which was asserted due to the failure of the debtor
to make PILOT payments; however, the court referred the dispute to the arbitration panel in any event (under a
different analysis exclusive to arbitration).  (Debtor's Obj. at ¶ 38 (citing *Cibro Petroleum Prods. Inc., et al v. City
of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 121 (S.D.N.Y. 2001).)

Agreements.  The Debtor argues that lifting the stay will interfere with the bankruptcy case because it will be forced to litigate with Syracuse in separate forums, causing an undue and unnecessary financial burden.  (Victor Opp. Aff. at ¶ 28.)  The Debtor argues that if Syracuse succeeds in the state court action, it will face eviction, eliminating any chance of reorganization, and the Debtor would have to spend a significant sum dismantling the Facility and selling its components at scrap value.  (*Id.*)  But the Debtor can only assume the Agreements with Syracuse if it, and not Syracuse, succeeds in the state court action; *i.e.*, if the Agreements have not been terminated prepetition.  Syracuse's success in the State Court Actions and termination of the Agreements will result in the Facility being returned to Syracuse in satisfaction of its security interest under Section 8.01 of the Lease.[9]  By permitting the parties to resolve issues surrounding termination in the state court where the court is very familiar with the facts and history of the case (and has already ruled on some of the issues), this Court will be better equipped to determine any remaining bankruptcy law issues, including any assumption motion, more quickly.

The Debtor further argues that litigation in the state court would prejudice the interests of other creditors because Syracuse is just one of its many creditors.  (Debtor's Obj. at ¶ 49.)  But this argument fails because it assumes that the State Court Actions threaten the Debtor's reorganization efforts.  It is certainly true that the Debtor will not be able to reorganize if the Lease terminated prepetition.  That issue must be resolved quickly.  As some court must decide these matters, the Debtor will not be prejudiced by having the state court determine the issues.[10]

---

[9]       Section 8.01 of the Lease provides that "[u]pon the expiration or earlier termination of this Lease in accordance with its terms, the Facility, together with all personal property used in the operation of the Facility (except the property excluded from surrender by Tenant to Owner pursuant to Section 17.01), and any improvements to the Premises shall become the property of Landlord without any further consideration by Landlord or any further act or deed required of either Landlord or Tenant."  The Court does not decide whether the turbines or other improvements are property of the estate if the Lease terminated prepetition.

[10]      The Debtor cites two cases in which a bankruptcy court would not lift the stay and instead determined leases had not terminated prepetition, but in both cases the courts recognized that termination issues were questions

Indeed, given the state court's familiarity with the issues in the State Court Actions, it is likely in a better position to give a quick ruling on the matters. Absent a motion to extend the time to assume or assign the Agreements, the Debtor, which admits it cannot reorganize without the Lease, will be no better or worse off in this Court.

> iii.     Factors (a) Four – Whether a Specialized Tribunal With the Necessary Expertise Has Been Established to Hear the Cause of Action; (b) Ten – the Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation; (c) Eleven – Whether the Parties Are Ready for Trial in the Other Proceeding

Factors four, ten and eleven weigh strongly in favor of permitting the state court litigation to proceed in front of Justice DeJoseph. The parties have been before Justice DeJoseph since 2008. The Agreements are complicated, long-term arrangements with which Justice DeJoseph is quite familiar. Justice DeJoseph relied on the Agreements when he issued the Summary Judgment Opinion in the Syracuse Action, and when he denied Project Orange's motion for a preliminary injunction in the Syracuse Action. *See* Summary Judgment Opinion; May 15 Tr. at 26. He has presided over "discovery, motion practice and conferences." (Syracuse Reply to Debtor's Obj. at ¶ 7.) The Debtor filed its petition on the eve of the hearing on the summary judgment motion in the Yellowstone Action and the Eviction Proceeding, which was the same day Justice DeJoseph intended to enter the Order granting the summary judgment dismissal of Project Orange's counterclaims in the Syracuse Action. *See* Letter from Justice DeJoseph to Jonathan B. Fellows, Esq., Thomas P. Puccio, Esq. and W. Bradley Hunt, Esq. (May 3, 2010). (Fellows Aff. Ex. K; *id.* at ¶¶ 18, 42–44.) Syracuse produced tens of thousands of documents

---

of state law, the landlords sought merely to lift the stay to re-let the premises (not return to state court for a determination) or a final judgment entered in a state court eviction proceeding was a nullity as it was entered after the commencement of the bankruptcy case, and the debtors filed assumption motions. *In re T.A.C. Group, Inc.*, 294 B.R. 199, 202 (Bankr. D. Mass. 2003); *In re PAVCO Enters., Inc.*, 172 B.R. 114, 118 (Bankr. M.D. Fla. 1994). In any event, neither court applied the *Sonnax* factors or engaged in any similar analysis, nor did the courts explicitly find prejudice if the state court were to decide the issues. The Court, in any event, in exercising its discretion, respectfully declines to follow these decisions here.

and conducted depositions of several witnesses in December 2009 in the Syracuse Action, long

after Syracuse contends the Debtor repudiated the Steam Contract in October 2009, the notice of

termination was sent and after Syracuse had commenced the summary proceeding. (Reply Aff.

of Jonathan B. Fellows at ¶ 2 (hereinafter "Fellows Reply Aff.").)  The Debtor's arguments that

discovery is necessary to determine the repudiation issues are unavailing.  The state court is the

most efficient and appropriate place for that discovery to take place and the decision to be made,

considering Justice DeJoseph's involvement in the various actions.

> iv.     *Factors (a) Three – Whether the Other Proceeding Involves the Debtor as A*
> *Fiduciary; (b) Five – Whether the Debtor's Insurer has Assumed Full*
> *Responsibility for Defending the state court action; (c) Six – Whether the*
> *Action Primarily Involves Third Parties; (d) Eight – Whether the Judgment*
> *Claim Arising from the Other Action is Subject to Equitable Subordination;*
> *(e)Nine- Whether Movant's Success in the Other Proceeding Would Result in*
> *a Judicial Lien Avoidable by the Debtor*

None of these factors weigh strongly in favor or against permitting the State Court

Actions to go forward.  Accordingly, the Court need not consider them equally with the other

factors and does not find them dispositive in its determination that the stay should be lifted.  *See*

*Burger Boys*, 183 B.R. at 688 (internal citations omitted).

> v.     *Factor Twelve - Impact of the Stay on the Parties and the Balance of Harms*

The Debtor argues that Syracuse will not suffer harm if the stay is not lifted, stating that it

will pay post-petition expenses including taxes and use and occupancy payments to Syracuse,

and that Syracuse can still provide steam to its customers regardless of the outcome of the

Motion.  (Debtor's Opp. to Motion at ¶ 52.)  Syracuse contends in its reply, however, that it is

being harmed because it "has no assurances that [Debtor] will pay its holdover tenant rent of

$150,000 per month, or [Syracuse's] damages from steam costs over the Steam Contract price.

Further, [it] cannot proceed with any plans to upgrade its steam facilities until [the Debtor's]

status is resolved."  (Fellows Reply Aff. at ¶ 50.)

In *Burger Boys,* 183 B.R. at 688, the court determined that the bankruptcy court adequately balanced the harms where it "craft[ed] an order that permitted [the debtor] an extension of sixty days to assume or reject the lease during which time the automatic stay would continue, provided [the landlord] received use and occupancy fees," and "abstained under an arrangement that would allow both parties to litigate their claims fully." Here, Syracuse and the Debtor will be able to litigate their claims fully in the State Court Actions. Justice DeJoseph has already dismissed Project Orange's counterclaims in the Syracuse Action. Granting relief extending the time to assume or reject the Lease is not appropriate here, nor is maintaining the stay until the Debtor determines whether to assume or reject the Lease. The Debtor has at least another 57 days to assume or assign the Lease under 11 U.S.C. § 365(d)(4), or until Friday, August 27, 2010 (or, until confirmation, if it occurs earlier), and until confirmation to assume the Operating Agreement and the Steam Contract unless the Agreements terminated prepetition, which the Court determines is an issue best resolved by the state court. Nothing in this Opinion and Order prohibits the Debtor from seeking further extensions of the time to assume or reject executory contracts and leases under 11 U.S.C. § 365(d)(4)(B). Accordingly, factor twelve weighs in favor of lifting the stay.

> 2. *Fact-Intensive Inquiry Similar to Sonnax Analysis Focused on Judicial Economy and Efficiency*

At least one district court has opined that a bankruptcy court must apply the *Sonnax* factors to determine whether to lift the stay under section 362(d)(1) where a landlord seeks to evict the debtor in state court. *See B.N. Realty Assocs. v. Lichtenstein (In re Lichtenstein)*, 238 B.R. 249, 258-59 (S.D.N.Y. 1999) (concluding that "while there may be situations where denial of relief from the stay for a landlord seeking to evict would be warranted, such denial must be

predicated on a thorough consideration of the statutory language of Section 362(d) and its elaboration in *Sonnax* and elsewhere" and noting "[t]he process of bankruptcy should not automatically become an added feature of the statutory protections given to tenants by New York's . . . laws") (internal quotation marks and citations omitted)). But other courts in the Second Circuit and elsewhere do not explicitly apply the *Sonnax* factors when examining lift stay motions to permit state court litigation to proceed. These courts focus on whether lifting the stay will return the parties to the prepetition status quo (and not create any new rights or take away any rights), essentially applying *Sonnax sub rosa. E.g.*, *In re Odd's-N'End's, Inc.*, 171 B.R. 10, 11 (Bankr. W.D.N.Y. 1994); *see also In re Brown*, 311 B.R. at 413 (applying *Sonnax* but recognizing that "there are a multitude of reported decisions discussing relief from the stay for 'cause,' all of which are fact intensive and generally offer no precise standards to determine when 'cause' exists to successfully *obtain* relief from the stay") (internal citations omitted) (emphasis in original).

Many of the cases applying this analysis concern situations in which a prepetition warrant of eviction has been issued, but not yet executed against the debtor. Under New York State Real Property Actions and Proceedings Law ("RPAPL") § 749(3), "[t]he issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises, and annuls the relation of landlord and tenant, but nothing contained herein shall deprive the court of the power to vacate such warrant for good cause shown prior to execution." N.Y. REAL PROP. ACT. & PROC. L. § 749(3) (McKinney 2008). This Court has previously refused to lift the stay to permit eviction proceedings to go forward where a warrant of eviction has been issued prepetition without first permitting the debtor to return to state court to vacate the warrant of eviction and giving the debtor an opportunity, to the extent vacatur is available, to cure

31

postpetition arrears.  *E.g., In re Sweet N Sour 7th Ave. Corp.,* 2010 WL 2471033 at *4-5

(acknowledging that a *Sonnax* analysis would lead to the same result).  Also, as the Debtor points

out, in *In re W.A.S. Food Service Corp.,* 49 B.R. 969, 973 (Bankr. S.D.N.Y. 1985) , the court

continued the stay for a "reasonable period of time" to permit the lessee to vacate a prepetition

warrant of eviction or provide for a "reasonable opportunity to renegotiate with the landlord."

(internal citation omitted).  Still, as Judge Gerber pointed out in *In re Eclair Bakery, Ltd.*, 255

B.R. at 136, distinguishing *In re W.A.S. Food Service Corp.*, courts do not "sanction indefinite

relief from the stay; rather, it suggests no more than a preservation of the status quo, and with

adequate protection to the landlord (including, at the least, full and timely payment of

postpetition rent), pending consideration by the state court of any fairly litigable issues."

Conversely, where the debtor has no chance of obtaining a vacatur of the state court

judgment, either because it has failed to follow through in prosecuting an appeal, or its previous

efforts to vacate or obtain "milder" forms of relief such as a "stay of eviction" have been denied,

the court will not permit the debtor to return to state court, but will lift the stay to permit the

landlord to proceed with eviction proceedings.  *E.g.*, *Bell v. Alden Owners, Inc.*, 199 B.R. 451,

458-62 (S.D.N.Y. 1996) (not explicitly applying *Sonnax* but determining that where a prepetition

warrant of eviction had issued, cause existed to lift the stay to permit landlord to cancel and sell

debtor's proprietary shares in cooperative apartment, as the debtor's "attempts to obtain an order

vacating the warrant and resurrecting the [l]ease were rejected on appeal to the Appellate Term,"

and "a debtor's inability to assume a lease constitutes 'cause' for relief from the automatic stay

under Bankruptcy Code section 362(d)(1)") (internal citations omitted); *In re GSVC Rest. Corp.,*

10 B.R. 300, 302 (S.D.N.Y. 1980) ("It would be chaotic if every eviction proceeding could

ultimately be frustrated by the last minute filing of a Chapter 11 proceeding in federal court.

There would be no finality whatever to state court landlord-tenant proceedings. . . .  Considering

the continual tactics employed by the debtor in frustrating and delaying the plaintiff's attempts to

evict it, in the absence of adequate protection for the plaintiff's interest in the property, this

determination [to lift the stay] was clearly correct."); *In re Griggsby*, 404 B.R. 83, 94 (Bankr.

S.D.N.Y. 2009); *In re Syndicom*, 268 B.R. 26, 45-46 (Bankr. S.D.N.Y. 2001); *In re Eclair*

*Bakery, Ltd.*, 255 B.R. at 137 (lifting the stay, finding "the Debtor's only claim of a defense to

the . . . rent obligation is a counterclaim/defense that its predecessor . . . waived at least twice,"

and thus "there is no basis whatever for the exercise of any applicable power of this Court to

protect the Debtor while it engages in further defaults and/or further delay, or to otherwise

protect it from the termination of the Lease that has already resulted in state court"); *see also In*

*re Odd's-N'End's, Inc.*, 171 B.R. at 11 (determining that state law "govern[ed] the rights of the

tenant after . . . 'termination' [of a lease]," and "[w]hatever those rights are, those are the rights

that the Debtor brought into this Court upon the filing of the Chapter 11 Petition, and the Debtor

is entitled to assert them in a court of appropriate jurisdiction")[11]; *Erie Blvd.*, 121 B.R. at 688

("While the filing of a bankruptcy petition pursuant to Chapter 11 of the Code is intended to

provide a debtor with protection from the onslaught of its creditors while it attempts to sort out

its liabilities and formulate an acceptable plan providing for their payment, it is not intended to

provide a debtor with an alternate forum to re-litigate issues which it could have or did litigate in

another forum pre-petition.") (internal citations omitted).  The *Erie Blvd.* court would "not pass

upon whether the Debtor was in default under the lease and whether the [landlords'] actions

---

[11]        The court also pointed out that "[t]he parties are encouraged to discuss the effect of this lift of stay upon the
Debtor's various duties under 11 U.S.C. § 365 in the event that the Debtor should ultimately prevail in state court.
For example, it would be a needless burden were this Court to have to determine someday the effect of the lapse of
time for assumption or rejection of leases, upon leases that were not 'reinstituted' until after such lapse.  If the
parties cannot now agree to how such questions will be resolved outside of court, then either is free to move now for
further relief in those regards."  *Id.* at 12 n.1.  As described *infra*, the Court suggests that Syracuse and the Debtor
take a similar course of action.

operated to terminate the lease prior to the date the [d]ebtor's petition was filed." *Id.* at 687.  It rejected the contention that the lease was the "cornerstone" of the debtor's chapter 11 plan in the sense that it wished to "market" the lease, as debtor was "not operating and apparently does not intend to operate its business from the leased premises in the future." *Id.* at 688.  *See also Matter of Williams*, 144 F.3d 544, 550 (7th Cir. 1998) ("Had the bankruptcy court not modified the stay so that the forcible entry case could go forward, likely it would then have to determine the merits to her right of possession.  With no particular expertise under this narrow area of state law, this would not be a particularly efficient use of judicial resources. Tenants might be encouraged to file a bankruptcy petition not only to forestall an eviction, but also to seek a more favorable forum for what might otherwise be a foregone conclusion.") (internal citation omitted).

Whether this Court explicitly applies *Sonnax* to determine that Syracuse is entitled to lift the stay, or engages in a more fact specific analysis, the results are the same.  As noted *supra,* Justice DeJoseph has resolved and familiarized himself with many of the issues and evidence that would otherwise be presented before this Court.  The Agreements present complicated issues of state law which are best resolved before Justice DeJoseph.  Like the courts in *Bell*, *Erie* and *In re Odd's-N'End's, Inc.*, this Court will not permit the relitigation of state court issues before it, nor will it pass on issues that only implicate state law and are better resolved in a state court.

3.    *Whether the Debtor Is Acting In Bad-Faith*

Syracuse also seeks to lift the stay, or in the alternative, dismiss the Debtor's case, due to the Debtor's alleged bad faith.  Bad faith may be sufficient "cause" to lift the stay.  *Sonnax*, 907 F.2d at 1286 (identifying "bad faith" as a *Curtis* factor, though not listing it with the other factors); *In re Eclair Bakery Ltd.*, 255 B.R. at 138.  The court can also dismiss a case due to the Debtor's bad faith.  11 U.S.C. § 1112(b); *In re C-TC 9th Avenue P'ship*, 113 F.3d 1304, 1310

(2d Cir. 1997).

"'[T]he standards for bad faith as evidence of cause,' whether in the context of dismissal or relief from the stay, 'are not substantively different from each other.'" *In re Eclair Bakery Ltd.*, 255 B.R. at 138 (citing *In re 234-6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr. S.D.N.Y.1997)); *In re MacInnis*, 235 B.R. 255, 259 (S.D.N.Y. 1998) (stating that "well established that a debtor's lack of good faith in filing a petition for bankruptcy constitutes sufficient 'cause' to lift the stay") (internal citations omitted).  "The good faith standard applied to bankruptcy petitions furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy." *In re Eclair Bakery Ltd.*, 255 B.R. at 137 (citing *In re C-TC 9th Ave. P'ship,* 113 F.3d at 1310 (internal quotation marks and citation omitted)).

In determining whether there is bad faith sufficient to dismiss the case or lift the stay, the court must analyze "whether the [d]ebtor and its principal have played by the rules; have met their obligations under the Bankruptcy Code; and have 'done equity' when invoking the equitable protections the Bankruptcy Code provides." *Id.*  The filing of a petition on the "eve of foreclosure or eviction" is not sufficient alone to constitute bad faith "cause" to lift the automatic stay, but is one of many circumstances which can be considered in a totality of the circumstances analysis. *Id.* at 137 (citing *In re 234-6 West 22nd St. Corp.*, 214 B.R. at 757).  Thus, "a bankruptcy filing intended in part to gain relief from a state-court action does not necessarily constitute bad faith," but where the debtor has a single asset, or no going concern, "the bankruptcy filing may have as its only purpose a hope to relitigate a state court action." *Sonnax*, 907 F.2d at 1287; *see also In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 850

(Bankr. S.D.N.Y. 1984) (dismissing petition filed contemporaneously with the state court entry

of "judgments on [certain] . . . promissory notes," as "debtor filed . . . to avoid the consequences

of adverse state court decisions while it continues litigating," and the "debtor is unable to

propose a meaningful plan of reorganization until its litigation . . . is resolved")  The court in

*Wally Findlay Galleries (New York), Inc.*, 36 B.R. at 850, refused to permit the debtor to "use [it]

as an appellate forum to review the state court's grant of summary judgment [against the debtor]

on [certain] notes in the context of a lease assumption."

The court in *In re C-TC 9th Avenue Partnership*, 113 F.3d at 1311, identified eight

factors weighing in favor of dismissing a case for bad faith:

(1) The debtor has only one asset;
(2) The debtor has few unsecured creditors whose claims are small in
relation to those of secured creditors;
(3) The debtor's one asset is the subject of a foreclosure action as a result
of arrearages or default on the debt;
(4) The debtor's financial condition is, in essence, a two party dispute
between the debtor and secured creditors which could be resolved in
[a] pending state foreclosure action;
(5) The timing of the debtor's filing evidences an intent to delay or
frustrate the legitimate efforts of the debtor's secured creditors to
enforce their rights;
(6) The debtor has little or no cash flow;
(7) The debtor cannot meet current expenses including the payment of
personal property and real estate taxes; and
(8) The debtor has no employees.

(citing *Pleasant Pointe Apartments, Ltd. v. Ky. Hous. Corp.*, 139 B.R. 828, 832 (W.D. Ky.

1992)).  Syracuse alleges that (1) the Debtor has one asset, the Facility, in which it only has a

possessory interest; (2) the Debtor has few unsecured creditors, whose claims are small in

relation to Syracuse's secured claims; (3) the Facility is the subject of an eviction proceeding

resulting from the prepetition termination of the Lease; (4) the Debtor's financial condition is "in

essence, a two-party dispute between [the Debtor and Syracuse], which can be resolved in the

pending state court proceedings"; (5) the Debtor demonstrated an intent to delay by filing for

36

bankruptcy on "the eve of an appearance in the state court action for argument of dispositive

motions," after multiple adjournments, which indicates an intent to "delay and frustrate the

legitimate efforts of [Syracuse] to enforce its rights under the Lease"; (6) the Debtor's budgets

reflect "virtually no cash flow," and the Debtor admits it must sell electricity on a "volatile" day-

to-day market, and buy gas on the spot market; (7) the Debtor cannot meet its current expenses,

most notably, real estate taxes, which Syracuse has been forced to pay on the Debtor's behalf; (8)

the Debtor has three identified employees, and those who operate the facility are independent

contractors.  (Motion at ¶ 88.)  In sum, Syracuse contends that the Debtor "does not hope to

assume the Lease and Steam Contract and perform under them, but to coerce [Syracuse] into new

contracts through endless legal proceedings," and "[e]ven if the Agreements had not been

terminated, [the Debtor] has provided no explanation of how it can possibly cure its defaults

under the Lease and assume it."  (*Id.* at ¶ 89.)  Syracuse further argues that the Agreements are

part of a single agreement, and, as such, any attempt to assume one (the Lease) and reject another

(the Steam Contract) would not be permissible under the Code, which, as indicated above, the

Court is not deciding at this juncture.  (Reply of Syracuse to Debtor's Opp. to Motion at ¶ 62.)

Syracuse also contends that the Debtor cannot confirm a chapter 11 plan without Syracuse voting

in favor.  (*Id.* at ¶ 67.)  Syracuse contends that the Debtor does not have a chance of reorganizing

and the Debtor "offers no prospect of performing its obligations under the Lease, Steam Contract

and Operating Agreement," offers no details of its prospective financing, and plans to "shed[ ]

itself of all obligations to [Syracuse], *i.e.*, the obligations set forth in the Steam Contract, while

continuing to occupy valuable real estate of [Syracuse] under the Lease for $1.00 per year."

(Reply of Syracuse to Debtor's Opp. to Motion at ¶¶ 52-56.)

      The Debtor makes a point-by-point response, the essence of which is its contention that it

may assume the Lease but reject the Steam Contract, and successfully reorganize once the turbines are fully operational.  (Debtor's Obj. to Motion at ¶¶ 57-65; Debtor's Sur-Reply to Syracuse's Reply to Debtor's Obj. to Motion at ¶ 17.)  Here, as noted above, whether the Debtor can assume and assign the Agreements, separately or together, is not before the Court.  The case has only been in this court since April 29, 2010, the Debtor at the very least has purported to secure financing and make progress in this case, and the Debtor has until August to assume the Lease, subject to further extensions for cause, and until confirmation to assume or reject the other Agreements.  Accordingly, the Court will not dismiss the case for bad faith under section 1112(b) at this juncture.  Furthermore, because Syracuse has demonstrated sufficient cause under *Sonnax,* its progeny, and other decisions of this court to lift the automatic stay under 11 U.S.C. § 362(d)(1), the Court need not find bad faith to lift the stay.

If Syracuse prevails in state court, and a warrant of eviction issues, there still may be bankruptcy law issues that this Court must decide before the Debtor should be evicted from the Facility.  Since the automatic stay may still apply to Debtor's possessory interest in the property, any warrant of eviction may not be executed without a further order from this Court.  Of course, if the Debtor prevails in state court, the parties will need to return to this Court to deal with issues concerning assumption or rejection of the Agreements.  As the court did in *In re Odd's-N'End's, Inc.*, 171 B.R. at 12 n.1, the Court encourages the parties to confer regarding this order's effect on the Debtor's duties under 11 U.S.C. § 365 in the event that the Debtor ultimately succeeds in state court, such as whether the Debtor can move to assume or assign a lease until the prepetition termination issue is resolved, which may be after the period to assume or reject nonresidential real estate leases lapses under section 365.  Either party is free to move for further relief as necessary if the parties cannot stipulate to an agreement.

## CONCLUSION

For the reasons explained above, Syracuse's motion to lift the automatic stay is

**GRANTED** except that any warrant of eviction may not be executed without a further order of

this Court.

Additionally, the Syracuse's motion to dismiss the case under 11 U.S.C. § 1112(b) is

**DENIED**.

**IT IS SO ORDERED.**

DATED:        July 1, 2010
                   New York, New York

                                            __/s/Martin Glenn_____
                                                MARTIN GLENN
                                            United States Bankruptcy Judge